*** FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER ***

**Electronically Filed
Supreme Court
SCWC-29036
24-APR-2015
08:12 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

———————————————————————————

BENJAMIN PAUL KEKONA and TAMAE M. KEKONA,
Petitioners/Plaintiffs-Appellees,

vs.

MICHAEL BORNEMANN, M.D.,
Respondent/Defendant-Appellant,

and

PAZ FENG ABASTILLAS,  also known as PAZ A. RICHTER;
ROBERT A. SMITH, personally; ROBERT A. SMITH, Attorney at Law,
a Law Corporation; STANDARD MANAGEMENT, INC.;
U.S. BANCORP MORTGAGE COMPANY, an Oregon company;
Respondents/Defendants.

———————————————————————————

SCWC-29036

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(ICA NO. 29036; CIV. NO. 93-3974)

APRIL 24, 2015

RECKTENWALD, C.J., NAKAYAMA, McKENNA AND POLLACK, JJ.,
AND CIRCUIT JUDGE TRADER, IN PLACE OF ACOBA, J., RECUSED

OPINION OF THE COURT BY NAKAYAMA, J.

Since 1993, Dr. Michael Bornemann has claimed lawful

ownership of a property that was fraudulently transferred to him

as part of a conspiracy to prevent Benjamin and Tamae Kekona from collecting on a judgment. Three separate juries have found that Bornemann's defense was not credible and that significant punitive sanctions were necessary. The issue in this case is whether the Intermediate Court of Appeals (ICA) gravely erred when it held that a $1,642,857.13 punitive damages award was grossly excessive and in violation of Bornemann's Fourteenth Amendment rights. We hold that Bornemann's conduct justified the entirety of the punitive damages award imposed by the third jury.

## I. BACKGROUND

### A. Factual Background

In the late 1980s, Petitioners/Plaintiffs-Appellees Benjamin Paul Kekona and Tamae M. Kekona (the Kekonas) sold a North Shore tour business that they had operated for many years so that they could retire to a home that they purchased on the island of Hawaiʻi. The Kekonas met Defendants Dr. Paz Feng Abastillas (Abastillas or Paz) and Robert A. Smith (Smith) in conjunction with the sale of the tour business, and Abastillas convinced them to serve as passive investors in a business operating a tram at Hanauma Bay. From the start, Abastillas and Smith mishandled the tram business, which forced the Kekonas out of retirement and into day-to-day management of the tram operations. Nonetheless, Abastillas and Smith filed a lawsuit (the Hanauma Bay case) against the Kekonas. Following a 1993

2

jury trial, the Kekonas prevailed on all of Abastillas and Smith's claims.  Additionally, the Kekonas obtained a substantial judgment on various cross claims that was later reduced to $191,828.27.

The jury rendered its verdict on May 25, 1993.  On May 26, 1993, Abastillas deeded her interest in 1212 Nuuanu Avenue, Apartment #1809, Honolulu, Hawaiʻi (the Honolulu Park Place or HPP property) to Respondent/Defendant-Appellant Dr. Michael Bornemann (Bornemann).  On June 1, 1993, Abastillas and Smith deeded their primary residence at 47-186 Kamehameha Highway, Kāneʻohe, Hawaiʻi (the Kāneʻohe property) to Bornemann.[1] Bornemann also signed a blank security agreement on June 1, 1993, loaning an unspecified sum to Smith.  The agreement referenced an appendix that allegedly listed the collateral for the loan.  However, no appendix was attached.[2]  Finally, on June 2, 1993, Bornemann took a security interest in various articles of Abastillas and Smith's personal property, allegedly in exchange for a $19,888 loan.[3]

_____

[1]     Two quitclaim deeds were recorded at the Bureau of Conveyances: (1) a quitclaim deed transferring the interest of Standard Management, Inc. and Robert A. Smith, Attorney at Law, a Law Corporation in the Kāneʻohe property to Abastillas; and (2) a quitclaim deed transferring Abastillas' interest in the Kāneʻohe property to Bornemann.

[2]     At trial, the Kekonas alleged that the blank security agreement was created to protect any residual assets that Abastillas and Smith had neglected to shield from the Kekonas' judgment.

[3]     The loan was recorded at the Bureau of Conveyances on June 2, 1993, and was secured by assorted personal effects including, for example, a washing machine, a small clock, worn lamp shades, an old toaster, and various other household goods.

The Kekonas filed the instant lawsuit against Abastillas, Smith, and their related companies on October 13, 1993. Bornemann was named as a co-defendant. The Kekonas alleged, among other things, that the HPP and Kāneʻohe properties were fraudulently transferred in violation of Hawaiʻi Revised Statutes (HRS) chapter 651C.[4] The Kekonas also claimed that Abastillas's notarization of the deed that transferred the Kāneʻohe property from Smith's law corporation to herself constituted an illegal notarization because a notary cannot lawfully notarize a transfer to which she is the beneficiary.

Upon receipt of the lawsuit, Bornemann, Abastillas, and Smith took several steps to make the conveyance of the Kāneʻohe property appear legitimate. On October 25, 1993, the defendants executed two properly notarized confirmatory quitclaim deeds that

---

[4]     HRS § 651C-4(a) (1985) provided then as it does now:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

    (1) With actual intent to hinder, delay, or defraud any creditor of the debtor; or

    (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

        (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

        (B) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

4

specifically acknowledged "a challenge to the validity of notarizations and acknowledgments to [the prior] quitclaim deeds."[5]  Abastillas and Bornemann also allegedly doctored their tax returns and filed amendments to prior tax returns to reflect a legitimate conveyance of the Kāneʻohe property.

Finally, Smith and Abastillas attempted to obscure the fact that although they had been living in the Kāneʻohe property since they transferred it to Bornemann, they had not paid any rent prior to receiving the Kekonas' complaint.  On October 18, 1993, Smith sent Bornemann a check to cover back rent from June and July of 1993.  The amount of the monthly rent was the same amount as the monthly mortgage payment, and thus, functioned as a "pass-through" payment.  Smith sent Bornemann a second rent check on November 14, 1993.

Six months later, Smith sent Bornemann a letter acknowledging that he and Abastillas owed eight months of back rent.  Because Smith claimed to be insolvent, he "assigned" to Bornemann his ownership interest in a timeshare with Vacation Internationale, Ltd. and his rights to one week at a Colorado resort.  Smith represented that the value of the two vacation timeshares was $12,000.  However, it appears that Bornemann had already acquired those interests on June 7, 1993, when he delivered a $12,000 check that was made payable to Smith and

---

[5]     Both confirmatory quitclaim deeds were recorded in the Bureau of Conveyances on October 27, 1993.

"VI". The Kekonas alleged that "VI" was an acronym for Vacation Internationale, Ltd.

## B. Procedural History

The first jury trial was held in the Circuit Court of the First Circuit (circuit court) in May of 1999.[6] At the close of trial, the jury returned a verdict in favor of the Kekonas. The jury found, among other things, that Abastillas, Smith, and their associated companies had transferred the HPP and the Kāneʻohe properties with the actual intent of delaying or defrauding the Kekonas, and that Bornemann had not received the properties in good faith or for reasonably equivalent value. The jury awarded a panoply of general and special damages, and imposed $250,000 in punitive damages against each of the defendants. Following post-trial motions, the circuit court found that the punitive damages award against Bornemann was excessive and ordered a new trial unless the Kekonas consented to reduce the punitive award to $75,000.[7]

The Kekonas did not agree to the remittitur and proceeded to a second trial.[8] Following retrial, the second jury imposed a $594,000 punitive award against Bornemann. Bornemann filed a motion for new trial and/or to eliminate or reduce punitive damages, which the court denied. The court entered a

---

[6]     The Honorable Rhonda A. Nishimura presided.

[7]     The circuit court did not reduce the punitive damages awarded against any of the other defendants.

[8]     The Honorable Victoria S. Marks presided.

final judgment that included the $594,000 punitive damages award on February 26, 2001.  Bornemann timely appealed to the ICA.

Before the ICA, Bornemann raised six arguments, three of which relate to the instant appeal.  He first argued that punitive damages should not be available in fraudulent conveyance cases.  Bornemann also argued that even if punitive damages were available, the circuit court should have reduced the punitive damages award because it was grossly excessive.  Finally, Bornemann argued that the circuit court erred when it instructed the jury that fraudulent transfers could be proven by a preponderance of the evidence rather than by clear and convincing evidence.  On June 8, 2006, the ICA affirmed the circuit court's judgment in part, including the punitive damages award.[9]

On appeal to this court, Bornemann argued that the ICA erred by affirming the $594,000 award of punitive damages against him and by failing to require the circuit court to instruct the jury that fraudulent transfers must be proven by clear and convincing evidence.  We held that although punitive damages could be imposed to punish fraudulent transfers, the proper evidentiary standard for determining whether a fraudulent transfer took place was proof by clear and convincing evidence.  Kekona v. Abastillas, 113 Hawaiʻi 174, 179, 182, 150 P.3d 823, 828, 831 (2006).  Accordingly, we remanded the case to the

---

[9]     Benjamin Kekona died while the first appeal to the ICA was pending.

circuit court for a new trial under the clear and convincing evidence standard.  We did not address whether the punitive damages award was grossly excessive.

**C.    The Third Trial and Subsequent Appeal to the ICA**

The third trial began in late December of 2007.[10] On the first day of trial, the Kekonas called Bornemann as a witness to establish the circumstances surrounding the various deeds that he had signed to acquire the Kāneʻohe and HPP properties.  In regard to the Kāneʻohe property, Bornemann asserted that he had loaned Abastillas in excess of $300,000, and that Abastillas had deeded him the Kāneʻohe property when it became clear that she would be unable to pay all of her creditors.  In regard to the HPP property, a rental condominium, Bornemann asserted that he had paid part of the down payment on the property and that he had also paid off a substantial portion of the mortgage, a fact that was supported by exhibits he introduced into evidence.  Bornemann asserted that all of these transactions began well before the Kekonas won their judgment against Abastillas and Smith, and that he had no knowledge of that judgment at the time of the challenged transactions.

To rebut Bornemann's assertions, counsel for the Kekonas called various witnesses to establish that Bornemann's loans to the Kekonas were concocted post-hoc as part of a

---

[10]    The Honorable Victoria S. Marks presided.

8

conspiracy to shelter assets from the Kekonas' judgment. Tax expert John Candon (Candon) explained that real estate depreciation allowances provide rental property owners substantial income tax deductions and that the IRS requires individuals to take such deductions. Candon opined that Bornemann's federal tax returns did not reflect ownership of either the Kāneʻohe property or HPP property prior to the Kekonas' 1993 judgment. The Kekonas also introduced evidence that Bornemann attempted to cover up his role in the conspiracy by filing a sham lawsuit against Abastillas and Smith in September of 2000. Counsel for the Kekonas noted that this lawsuit was later dismissed for failure to prosecute.

Finally, counsel for the Kekonas impeached Bornemann's credibility through extensive adverse examination. For example, Bornemann testified that he loaned Abastillas tens of thousands of dollars but that he had no idea what the money was going to be used for, whether Abastillas had provided promissory notes, whether he had charged interest, or whether Abastillas had repaid those loans. Bornemann testified that Abastillas called him and asked for $126,000 one week before the original jury returned its verdict but that he couldn't recall what she planned to use the money for or if he had even asked. Bornemann testified that when he discovered that Abastillas had lost her lawsuit with the Kekonas, he accepted a hasty transfer of the Kāneʻohe property

without escrow, title investigation, or inquiry into the legal significance of a quitclaim deed, simply because he trusted Abastillas.  Most strikingly, Bornemann admitted that after he received and reviewed the Kekonas' fraudulent transfer lawsuit, he re-executed confirmatory deeds to the property without consulting an attorney to determine the legality of his continued actions.  The Kekonas used these examples to establish a primary theme, that Bornemann's claimed ignorance reflected "a serious problem with accepting responsibility for his actions."

With respect to punitive damages, counsel for the Kekonas asked Mrs. Kekona what justified her request for a $2,000,000 award.  She explained: "One million for me and one million for my husband. . . . [W]e need to have Dr. Bornemann punished.  We need to have that so that he does not ever again . . . conspire to withhold property and prevent people from collecting on their judgments and, uh, causing people so much agony."  Counsel continued:

> Q: Mrs. Kekona, are there any monetary reasons why you're asking for one million for Ben and one million for you?
>
> A: The mon – yes, there is.  For this case alone, which is not including this instant case, we owe in lawyers fees $600,000 plus 20 percent . . . of whatever judgment we win, if any.

Mrs. Kekona also testified about the impact that years of litigation and the inability to recover on the original judgment had on her and on her husband:

> Q: Mrs. Kekona, did you ever get to retire to Hilo in –-
>
> A: We went back and forth to Hilo, but, uh, we lost our

10

home.

Q: How did you lose your homes?

. . . .

A: We lost our home, first the one on Volcano was $79,000, and then our dream retirement home in Hilo we lost. Uh, it was a three bedroom, one and a half acre home, and we were planning to retire there. But we had to use that to pay Mr. Eggers.

Q: So you had to use --

A: And not only that. We spent so many of our retirement years -- instead of enjoying our retirement we were spending it in court in litigation and all these problems.

Q: Did you eventually have to move back, yourself, back to Honolulu?

A: Yes. After my husband passed away . . . .

Bornemann's counsel cross-examined Mrs. Kekona regarding attorney's fees as follows:

Q: I'd like to talk to you a minute about the attorney's fees. Okay?

A: Yes.

Q: Do you [have] any bills, lawyer's fees?

A: We certainly do.

Q: Where are they?

A: Where are they?

Q: Yes.

A: I don't have them with me, but we have it at home.

Q: Hmm. And do you have any checks or any other indications of payments you've made?

A: Yes, we do.

Q: Where is that?

A: We paid that every month.

Q: Where are they?

A: At home.

. . . .

11

> Q: The hundred thousand dollars that you said you've actually paid, is there any of that amount that you can identify as money that was expended for attorney's fees just against Dr. Bornemann.
>
> A: No, I don't think so.

In closing argument to the jury, the Kekonas requested compensation "for a 14 year journey through the Court system." Counsel stressed the length of the conspiracy and Bornemann's unwillingness to take responsibility for his own actions as factors supporting a $2,000,000 punitive damages request:

> How long does this conspiracy to defraud go on? It goes on until 1999, when Dr. Bornemann, who that year had adjusted gross income of . . . 279,000 dollars, allows the [Kāneʻohe] property to go in foreclosure. . . . Why? Because Smith and Abastillas were still living there. Were they paying rent? And if so, then Dr. Bornemann was keeping it.
>
> If they were not paying rent, why do we not see any letters going to the tenants saying hey, you're not paying the rent. I can't make my mortgage payments. The scam continued in [1999]. And remember, he said that well, his attorney told him to do it. Dr. Bornemann has a serious problem with accepting responsibility for his actions. And that's a graphic example.
>
> And we come to the year 2000. Dr. Bornemann sues Abastillas and Smith. Why, this was a shocker. He says all kinds of stink things about him in that lawsuit. And he admits that that attorney told him well, this is to separate you out from Paz and Smith because oh, they've caused you a lot of problems. At the same time, Miss Abastillas is still going up to his house.
>
> Does that sound like a bona fide lawsuit? Or does it sound like a setup, a fraud, a shibai, something to mislead other people? And what happens to that lawsuit after it's filed. It's dismissed for failure to prosecute. And Dr. Bornemann again says that's my attorney's fault.

Counsel also focused on the Kekonas' financial vulnerability and on their advanced age in support of a substantial punitive award. He stated:

> Mr. Kekona dies nine years into this case. He couldn't see it through the end. Paz and Smith lived in that property for years and years following the filing of this lawsuit. Do you remember for probably for the most part they lived

12

rent free.

. . . .

You know, you get a judgment after four years of litigation. It's so exhaustive that the attorney decides to take a sabbatical.  How exhausting must that have been?  Bill Eggers, the attorney, took a sabbatical after it was over.

So the Kekonas wanted to collect a mere 191,000.  They had to give their attorney two homes on the Big Island in payment of his fees.  So they weren't even getting back everything they lost.  When they went to collect, they found interference of the first order.  It was put there by Mr. Smith, Miss Abastillas, with their get-along, go-along accomplice, Dr. Bornemann.

Counsel also noted that Bornemann's net worth exceeded $2.25 million dollars.  Counsel explained that Bornemann attempted to take advantage of the Kekonas' vulnerability by engaging in a war of attrition: "I think it's because of his money.  But he didn't care.  He could defeat this by use of his money and resources."  Counsel concluded by discussing what he described as Bornemann's misuse of the judicial system:

I want to talk about respect for the law, respect for legal procedures.  I have always felt this case is slightly misnomered in that it should be called interference with court procedures.

. . . .

There is no respect for the legal processes shown in this case.  He didn't respect it when he received the lawsuit. He went right ahead and signed more deeds.  He didn't respect it years later when his attorney filed . . . a shibai lawsuit against Paz and Smith. . . .

I think this jury should keep in mind that as well educated as Dr. Bornemann is, everybody in America should have respect for the law.  And I think that's the point that this jury must make in this case.  Unfortunately, the way we do it here is money.  And that is why Mrs. Kekona personally and on behalf of her husband's estate respectfully asks for the damages that we talked about earlier.

At the close of trial, the jury found by clear and convincing evidence that the transfer of the Kāneʻohe property

13

was fraudulent. However, the jury found that the Kekonas failed to establish by clear and convincing evidence that the transfer of the HPP property was fraudulent. The jury awarded the Kekonas $253,000 in special damages to compensate for the interest that had accrued on the Kekonas' initial $191,000 judgment.[11] The jury also imposed $1,642,857.13 in punitive damages. Bornemann filed a post-trial motion to amend judgment on the grounds that the punitive damages award was grossly excessive and that attorney's fees should have been apportioned. The circuit court denied Bornemann's motion and entered final judgment.

Bornemann timely appealed to the ICA on February 28, 2008. On appeal, Bornemann argued that the punitive damages award was grossly excessive and in violation of his rights under the Fourteenth Amendment. Bornemann also argued that the $253,000 special damages award constituted double recovery. The ICA agreed, concluding that a punitive award of $250,000 was sufficient to punish Bornemann. Accordingly, the ICA vacated the punitive damages award and ordered the circuit court to provide the Kekonas with the option to remit $1,392,857.10 in punitive damages or proceed to a fourth jury trial. The ICA also vacated the $253,000 special damages award.

The Kekonas timely filed an application for writ of certiorari requesting this court's review of the punitive damages

_____

[11]     HRS § 478-3 (1986) provides: "Interest at the rate of ten per cent a year, and no more, shall be allowed on any judgment recovered before any court in the State, in any civil suit."

14

award.

## II. STANDARDS OF REVIEW

Two levels of review are applicable when a punitive damages award is challenged as excessive.  The first inquiry proceeds under state law, and the second, if raised, is governed by federal due process standards.  See Cooper Indus., Inc. v. Leatherman Tool Co., 532 U.S. 424, 450 (2001), (Ginsburg, J., dissenting) (explaining that Supreme Court precedent now "requires lower courts to distinguish between ordinary common-law excessiveness and constitutional excessiveness.").

### A.    Excessiveness Under State Law

"Award or denial of punitive damages is within the sound discretion of the trier of fact.  The trier of fact's decision to grant or deny punitive damages will be reversed only for a clear abuse of discretion."  Amfac, Inc. v. Waikiki Beachcomber Inv. Co., 74 Haw. 85, 138, 839 P.2d 10, 36-37 (1992) (internal citations omitted).  "The proper measurement of punitive damages should be '[t]he degree of malice, oppression, or gross negligence which forms the basis for the award and the amount of money required to punish the defendant.'"  Kang v. Harrington, 59 Haw. 652, 663, 578 P.2d 285, 293 (1978) (quoting Howell v. Associated Hotels, 40 Haw. Terr. 492, 501 (1954)).  "[T]he inquiry on review is limited to whether, 'upon the evidence adduced, reasonable men [and women] could have come to

15

the same conclusion as the jury, or the trial court in a jury-waived case.'" Romero v. Hariri, 80 Haw. App. 450, 458, 911 P.2d 85, 93 (1996) (quoting Lima v. Tomasa, 42 Haw. 478, 483 (1958)).

## B.    Federal Due Process Review

An award of punitive damages implicates rights that are guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. See BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 562 (1996) ("The Due Process Clause of its own force . . . prohibits the States from imposing 'grossly excessive' punishments on tortfeasors."). "[T]he question whether a punitive damages award is constitutionally excessive calls for the application of a constitutional standard to the facts of a particular case, and in this context de novo review of that question is appropriate." Cooper Indus., 532 U.S. at 435 (quoting United States v. Bajakajian, 524 U.S. 321, 336-37 (1983)).

## III. DISCUSSION

## A.    State Law Principles

A punitive damages award is an extraordinary remedy and is only imposed when "the defendant's wrongdoing has been intentional and deliberate, and has the character of outrage frequently associated with crime." Masaki v. Gen. Motors Corp., 71 Haw. 1, 6, 780 P.2d 566, 570 (1989) (internal quotation marks and citation omitted). The fundamental purpose of punitive

16

damages is to "punish[] the defendant for aggravated misconduct and [to] deter[] the defendant and others from engaging in like conduct in the future."  Id. at 12, 780 P.2d at 573; see also, Kang, 59 Haw. at 660, 578 P.2d at 291; Howell, 40 Haw. Terr. at 499.  "In such circumstances, utilizing the civil law to shape social behavior is both logical and desirable."  Id. at 9, 780 P.2d at 571 (internal quotation marks and citation omitted).

Because punitive sanctions are quasi-criminal in nature, Hawaiʻi imposes special safeguards to ensure that a defendant is neither unfairly stigmatized nor arbitrarily deprived of his or her property.  See Masaki, 71 Haw. at 6, 780 P.2d at 570.  Accordingly, this court has imposed a clear and convincing standard of proof, the highest civil standard of proof, for all punitive damage claims.  Id. at 16, 708 P.2d at 575.

> The plaintiff must prove by clear and convincing evidence that the defendant has acted wantonly or oppressively or with such malice as implies a spirit of mischief or criminal indifference to civil obligations, or where there has been some willful misconduct or that entire want of care which would raise the presumption of indifference to consequences.

Id. at 16-17, 780 P.2d at 575.  The clear and convincing evidence standard requires "that degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established, and requires the existence of a fact be highly probable."  Id. at 15, 780 P.2d at 574.  That

17

standard was applied in this case.[12]

Once a punitive damages award has been rendered, the magnitude of the award is subject to review at the trial court level as well as appellate review. On appeal, we analyze whether the damages awarded by the jury were "'palpably not supported by the evidence, or so excessive and outrageous when considered with the circumstances of the case as to demonstrate that the jury in

---

[12] Jury instructions serve as an additional safeguard with respect to the magnitude of a punitive award. In this case, the court instructed the jury as follows:

> The proper measure of punitive damages is 1, the degree of intentional, willful, wanton, oppressive, or malicious conduct; 2, the amount of money required to punish the defendant, considering his financial condition, without considering the value of either Honolulu Park Place or the Kaneohe property; and 3, the reasonable and necessary expense of litigation, including attorney's fees, expert witness fees, and the inconvenience and time involved in preparing for trial.

Although this instruction properly stated the law, more explicit jury instructions would provide an additional procedural safeguard. For example, Illinois Pattern Civil Jury Instruction 35.00 (2007) provides:

> In arriving at your decision as to the amount of punitive damages, you should consider the following three questions. The first question is the most important to determine the amount of punitive damages:
>
> 1. How reprehensible was [(defendant's name)] conduct?
>
> On this subject, you should consider the following:
>
>> a) The facts and circumstances of defendant's conduct;
>> b) The [financial] vulnerability of the plaintiff;
>> c) The duration of the misconduct;
>> d) The frequency of defendant's misconduct;
>> e) Whether the harm was physical as opposed to economic;
>> f) Whether defendant tried to conceal the misconduct;
>> g) [other]
>
> 2. What actual and potential harm did defendant's conduct cause to the plaintiff in this case?
>
> 3. What amount of money is necessary to punish defendant and discourage defendant and others from future wrongful conduct [in light of defendant's financial condition]?

assessing damages acted against rules of law or suffered their passions or prejudices to mislead them.'"  Kang, 59 Haw. at 663, 578 P.2d at 292 (quoting Vasconcellos v. Juarez, 37 Haw. Terr. 364, 366 (1946)).

## B.  The Punitive Award in This Case

With the twin interests of punishment and deterrence in mind, and considering the Kekonas' substantial attorney's fees and the presence of several aggravating factors, we conclude that the evidence presented to the third jury adequately substantiated the $1,642,857.13 punitive damages award that the jury rendered.

### 1.  Attorney's Fees

As a starting point, the punitive award contains a sizable component that corresponds to the Kekonas' two decades of attorney's fees.  See Lee v. Aiu, 85 Hawaiʻi 19, 936 P.2d 655 (1997) (uncompensated attorney's fees may comprise a portion of a punitive damages award).  In Lee, this court adopted "the majority view that a jury should be allowed to consider a plaintiff's attorney fees in determining the amount of a punitive damages award."  85 Hawaiʻi at 34, 936 P.2d at 670 (citing Masaki, 71 Haw. at 8 n.2, 780 P.2d at 572 n.2; Kunewa v. Joshua, 83 Hawaiʻi 65, 77, 924 P.2d 559, 571 (App. 1996)).  There are two limitations: First, "[w]hen considering attorney's fees in calculating the amount of the punitive damage award, the fee amount must be 'reasonable and necessary.'"  Id. at 35, 936 P.2d

19

at 671 (citation omitted).  Second, "[a]ttorneys' fees cannot be awarded in addition to exemplary damages; rather, they must constitute the whole of the punitive damage award or be accounted for as a portion of the total punitive damage award."  Id.; see also Romero, 80 Hawaiʻi at 458-59, 911 P.2d at 93-94.

In this case, the Kekonas presented sufficient evidence for the jury to conclude that they had accrued $600,000 in attorney's fees and expenses over fourteen years of litigation. Their attorney's fees reasonably corresponded to the extensive discovery required to expose the fraudulent transfer, three jury trials, the cost of hiring expert witnesses, voluminous pre-trial and post-trial motions, and several appeals to the ICA and to this court.  Although Bornemann attempted to impeach Mrs. Kekona because she did not introduce written documentation of the attorney's fees she incurred, the testimony of a single witness, if found credible by the jury, constitutes sufficient evidence to support a finding.  See In re Doe, 95 Hawaiʻi 183, 196-97, 20 P.3d 616, 629-30 (2001).  Here, Mrs. Kekona's testimony regarding the attorney's fees she had incurred as a result of Bornemann's conduct was sufficient to sustain $600,000 of the punitive award.

Bornemann argues that the Kekonas have grossly exaggerated their fees and costs.  First, he argues that the fees incurred were not solely incurred against him, and that large portions corresponded to litigation against other defendants. However, it is well settled that "where the wrongful act of a

20

defendant causes a plaintiff to engage in litigation with a third party in order to protect his or her rights or interests, attorney's fees incurred in litigating with that third party may be chargeable against the wrongdoer as an element of the plaintiff's damages." Lee, 85 Hawaiʻi at 33, 936 P.2d at 669.

Second, Bornemann argues that some of the attorney's fees corresponded to the original jury trial in the Hanauma Bay case. At trial, Bornemann could have cross-examined Mrs. Kekona on that point, but he did not. "[I]f a party does not raise an argument at trial, that argument will be deemed to have been waived on appeal." State v. Moses, 102 Hawaiʻi 449, 456, 77 P.3d 940, 947 (2003).

Third, Bornemann cites the ICA's 2006 Memorandum Opinion as evidence that only $200,000 in fees had been incurred over the course of the first two trials. Bornemann argues that the additional $400,000 claimed by Mrs. Kekona "defies logic or belief." Again, this point could have been raised in cross-examination to impeach Mrs. Kekona's testimony, but was not.[13]

In sum, $600,000 of the $1,642,857.13 punitive award is justified as compensation for attorney's fees and costs.

2.    The Remainder of the Punitive Award

The remaining question is whether Bornemann's conduct justified a $1,042,857.13 punitive award, which is roughly four

---

[13]    Neither Bornemann's second nor his third argument were raised in his post-trial motion to amend the verdict.

times as large as the $253,000 compensatory award in this case.[14]

Based on the presence of several aggravating factors, we conclude

that it does.

### a.    Fraudulent Transfers

Fraudulent transfers are a common method of shielding

assets from creditors and other individuals with legitimate

claims to property.[15]  There is a considerable incentive to

defraud because fraudulent transfers are easy to promulgate but

difficult to prove: a fraudulent debtor boasts an apparently

valid deed while the defrauded creditor must confront the reality

that "the intent to hinder, delay, or defraud creditors is seldom

susceptible of direct proof."  Uniform Fraudulent Transfer Act,

Prefatory Note at 4 (1984).  Further, HRS § 651C-8 (Supp. 1985)

limits a defrauded creditor's actual damages to "the value of the

asset transferred . . . or the amount necessary to satisfy the

creditor's claim, whichever is less."[16]  In other words, at worst

the fraudulent debtor is forced to pay what he or she already

---

[14]    Although the ICA vacated the $253,000 special damages award, the $253,000 figure still serves as a fair estimation of the statutory interest damages that accrued as of the date of the third jury's verdict.

[15]    Fraudulent transfers have been prevalent throughout the entirety of the American judicial tradition.  In 1918, the first uniform act codified the "better" decisions of several states that had applied England's Statute of 13 Elizabeth.  The act was updated in 1984 and subsequently adopted by Hawaiʻi and 42 other states.  See Uniform Fraudulent Transfer Act, Prefatory Note at 4 (1984).

[16]    The availability of punitive damages is not constrained by HRS § 651C-8 because the UFTA contains a savings clause that provides: "Unless displaced by the provisions of this chapter, the principles of law and equity . . . supplement its provisions."  HRS § 651C-10.

owed.  Without the possibility of significant punitive damages, it would be difficult to deter this conduct.

We conclude that a fraudulent transfer promulgated with the intent required to impose punitive damages justifies a punitive award at a 2:1 ratio to the actual damages suffered by the plaintiff.[17]  This amount is supported by comparison to "the civil or criminal penalties that could be imposed for comparable misconduct."  BMW, 517 U.S. at 583.  The Hawaiʻi legislature has declared that treble damages (i.e. a 2:1 ratio) are an appropriate sanction for unfair, deceptive, or fraudulent acts committed in the course of commerce.  See HRS § 480-13(b)(1) (Supp. 2005) (punishing deceptive practices with the greater of "threefold damages" or "$1,000" in addition to "reasonable attorney's fees" and the "costs of suit").

In this case, Bornemann's decision to sign confirmatory quitclaim deeds immediately after he was served as a defendant in the Kekonas' fraudulent transfer lawsuit illustrates an intentional decision to hinder the Kekonas' attempt to collect a legitimate debt.  See BMW, 517 U.S. at 576 ("[I]nfliction of economic injury, especially when done intentionally through affirmative acts of misconduct or when the target is financially vulnerable, can warrant a substantial penalty." (internal citation omitted)).  The third jury was justified in imposing

---

[17]     This results in an award of treble damages once the compensatory and punitive awards are combined.

$506,000 in punitive damages against Bornemann based solely on his decision to participate in a fraudulent transfer "with such malice as implies a spirit of mischief or criminal indifference to civil obligations."  Masaki, 71 Haw. at 16-17, 780 P.2d at 575.

### b.    Aggravating Factors

The Hawaiʻi legislature has repeatedly declined to cap punitive damages at treble damages.  See Denise E. Antolini, Punitive Damages in Rhetoric and Reality: An Integrated Empirical Analysis of Punitive Damages Judgments in Hawaiʻi, 1985-2001, 20 J.L. & Pol'y 143, 189-207 (Spring 2004) (explaining that the Hawaiʻi legislature declined to enact proposed bills that would have capped punitive damages at either twice or three times the compensatory award in 1991, 1993, 1996, 1997, 1998, 1999, and 2001).  Accordingly, higher ratios of damages may be imposed to punish and deter aggravated misconduct.  In this case, the remaining $536,857.13 of the punitive damages award is supported by the presence of several aggravating factors.

First, Bornemann engaged in a pattern of repeated conduct with knowledge that his actions would cause substantial civil harm to the Kekonas.  See BMW, 517 U.S. at 576 ("[E]vidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required

24

to cure the defendant's disrespect for the law."). Evidence at trial suggested that in addition to executing multiple fraudulent deeds to the Kāneʻohe property, Bornemann took a mortgage on a substantial portion of Abastillas and Smith's personal property, signed a blank promissory note, filed fraudulent tax returns, accepted "pass-through" rent payments, filed a "sham" lawsuit, and attempted to drain the Kāneʻohe property of equity by allowing it to fall into foreclosure, all so that the Kekonas would be unable to collect on their original judgment. Indeed, the majority of these actions occurred after Bornemann had received and read the Kekonas' fraudulent transfer lawsuit.

Second, Bornemann harmed an elderly and financially vulnerable couple. See BMW, 517 U.S. at 576, 588 (characterizing conduct that targets elderly or financially vulnerable individuals as "the most serious"); Campbell v. State Farm Mut. Auto. Ins. Co., 98 P.3d 409, 418 (Utah 2004) (holding that financial misconduct by an insurer that targeted a financially and emotionally vulnerable family warranted punitive damages at a 9:1 ratio) cert denied, 543 U.S. 874 (2004); cf. HRS § 480-13(b)(1) (providing a damages enhancement for elderly plaintiffs victimized by deceptive practices); HRS § 480-13.5 (providing additional civil penalties of up to $10,000 per deceptive act against an elder). Bornemann's misconduct occurred in the immediate wake of intense litigation wherein the Kekonas incurred

substantial litigation fees and costs.  The evidence suggests that the defendants saw the Kekonas' unique vulnerability and sought to exploit it.  Because of Bornemann's participation in the fraudulent transfer of the Kāneʻohe property, the elderly Kekonas could not collect on their judgment and had to sign over their three-bedroom retirement home on the island of Hawaiʻi to their original attorney.  Mr. Kekona died during the pendency of litigation without collecting anything on the original judgment and with his retirement plans greatly disrupted.  The Kekonas were forced to consign years of their retirement to full-scale litigation in order to recover amounts that they were legitimately owed.

Considered in its entirety, the record supports the punitive damages awarded by the third jury.  Six hundred thousand dollars of the award is justified as compensation for the Kekonas' attorney's fees and costs.  Five hundred and six thousand dollars of the award is justified as a means to deter and punish Bornemann's intentional participation in a fraudulent transfer.  The remainder is justified as a means to punish aggravated misconduct that included targeting an elderly and financially vulnerable couple, and engaging in repeated unlawful conduct with knowledge of the civil harm that conduct created.  In sum, we are left with the firm belief that $1,642,857.13 reflects "[t]he degree of malice, oppression, or gross negligence

26

which forms the basis for the award and the amount of money required to punish the defendant." Kang, 59 Haw. at 663, 578 P.2d at 293 (citation and quotation marks omitted).

**C.   The Punitive Damages Award Survives Federal Due Process Review**

Although "States possess discretion over the imposition of punitive damages, it is well established that there are procedural and substantive constitutional limitations on these awards." State Farm, 538 U.S. at 416. "The Due Process Clause of the Fourteenth Amendment prohibits a State from imposing a 'grossly excessive' punishment on a tortfeasor." BMW, 517 U.S. at 562. "Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him [or her] to punishment, but also of the severity of the penalty that a State may impose." Id. at 574. "To the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property." State Farm, 538 U.S. at 417.

Federal due process review is de novo, Cooper Indus., 532 U.S. at 435, and is based on three guideposts: (1) the degree of reprehensibility of the defendant's conduct; (2) the ratio of the punitive damages award to the harm suffered by the plaintiff; and (3) a comparison to the civil penalties authorized or imposed in comparable cases. See BMW, 517 U.S. at 575. Given that these guideposts were considered at length in our state law analysis,

27

and mindful of the <u>de novo</u> standard required by the Supreme Court, we conclude that the punitive damages awarded by the third jury did not violate Bornemann's federal due process rights.

## IV. CONCLUSION

For the foregoing reasons, we vacate the ICA's September 16, 2013 Judgment on Appeal to the extent that it vacated the punitive damages award against Bornemann and remand to the circuit court for further proceedings consistent with this opinion.

| | |
|---|---|
| Fred Paul Benco<br>for petitioners | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| Peter Van Name Esser<br>for respondent<br>Michael Bornemann, M.D. | /s/ Sabrina S. McKenna |
| | /s/ Richard W. Pollack |
| | /s/ Rom A. Trader |

