FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER

**Electronically Filed**
**Intermediate Court of Appeals**
**CAAP-16-0000845**
**15-AUG-2019**
**08:23 AM**

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

---o0o---

DONNA LEE CHING, Plaintiff-Appellant/Cross-Appellee,
v. NANCY LOO DUNG, individually, and as Trustee under
that certain unrecorded Nancy Loo Dung Revocable Living
Trust dated September 8, 1993; The Estate of DENNIS QUAN
KEONG DUNG, deceased, as Trustee under that certain
unrecorded Irrevocable Trust for Dixon Quan Hon Dung,
dated June 21, 1995, and as Trustee under that certain
unrecorded Nancy Loo Dung Revocable Living Trust dated
September 8, 1993; PATSY BOW YUK DUNG, individually, and
as Trustee under that certain unrecorded Revocable Trust
Agreement dated August 19, 2003; DIXON QUAN HON DUNG; BILLIE
DUNG; ANNETTE KWAI FAH DUNG; DENBY DUNG; DARAH DUNG; DEAN DUNG,
Defendants-Appellees/Cross-Appellants, and
JOHN DOES 1-10; JANE DOES 1-10; DOE PARTNERSHIPS
1-10; DOE CORPORATIONS 1-10; DOE ENTITIES 1-10; and
DOE GOVERNMENTAL UNITS 1-10, Defendants.

DONNA LEE CHING, Individually, Plaintiff-Appellant/
Cross-Appellee, v. ANNETTE KWAI FAH DUNG, Personal
Representative of the Estate of Dennis Quan Keong Dung;
PATSY BOW YUK DUNG, Trustee of the Revocable Trust of Patsy
Bow Yuk Dung dated August 19, 2003; ANNETTE DUNG, Individually;
BILLIE DUNG, Individually; DARAH DUNG, Individually;
DEAN DUNG, Individually; DENBY DUNG, Individually,
Defendants-Appellees/Cross-Appellants, and
JOHN DOES 1-10; JANE DOES 1-10; DOE TRUSTEES 1-10;
DOE CORPORATIONS 1-10; DOE PARTNERSHIPS 1-10; DOE LIMITED
LIABILITY COMPANYS 1-10; and DOE ENTITIES 1-10, Defendants.

NO. CAAP-16-0000845

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CIVIL NOS. 07-1-1116-06 (GWBC) and 13-1-2929-11 (GWBC))

AUGUST 15, 2019

FUJISE, PRESIDING JUDGE, LEONARD AND REIFURTH, JJ.

OPINION OF THE COURT BY LEONARD, J.

This case stems from a dispute between neighbors over an easement, which escalated into a variety of incidents of alleged wrongful conduct by each side against the other. This appeal raises numerous issues, and we conclude that the trial court erred in a number of instances and this case must be remanded for a new trial.

Plaintiff/Counterclaim-Defendant/Appellant/Cross-Appellee Donna Lee Ching (**Ching**) appeals from: (1) the Order Denying [Ching's] Motion for Additur or New Trial, filed on November 14, 2016 (**Order Denying Additur**); and (2) the Final Judgment, filed on September 15, 2016 (**Judgment**), by the Circuit Court of the First Circuit (**Circuit Court**).[1] Defendants/Counterclaim-Plaintiffs/Appellees/Cross-Appellants Annette Dung (**Annette**), Darah Dung (**Darah**), Dean Dung (**Dean**), Denby Dung (**Denby**), and Dixon Quan Hon Dung (**Dixon**) (collectively, the **Dungs**) cross-appeal from: (1) the Order Granting in Part, and Denying in Part, Defendants/Counterclaimants' Motion for Judgment as a Matter of Law [(**JMOL**)], filed on April 12, 2016 (**Order re JMOL**); (2) the Judgment; (3) the Order Denying Defendants/

_____

[1] The Honorable Gary W.B. Chang presided.

2

Counterclaimants' Renewed Motion for Judgment as a Matter of Law, filed on January 4, 2017 (**Order Denying Further JMOL**); and (4) the Order Denying Defendants/Counterclaimants' Motion for a New Trial or Remittitur, filed on January 4, 2017 (**Order Denying New Trial**).

I.   BACKGROUND

   A.   The Creation of the Easement

      Ching owns and resides at a property located on Wilder Avenue in Honolulu, Hawai'i (**Ching Property**), which is also known as "Lot 28". The Dungs own and live on an adjacent property, which is located on Hoonanea Street, in Honolulu, Hawai'i (**Dung Property**), which is also known as "Lot 27". Ching's predecessor-in-interest, Mary Ching, previously owned all the land on which the Ching Property and Dung Property now stand, but in 1944 applied to have the property subdivided. Mary Ching's petition to subdivide the property was approved by the Land Court on September 29, 1944. Land Court Order 5938 (**Order 5938**) authorized and approved the subdivision upon the Land Court's review of, *inter alia*, "the Petition stating that Lot 28 [the Ching Property] will have access to Hoonanea Street over Easement 'A'". Attached to Order 5938 is "Map 8," which identifies Easement A, which runs along the edge of Lot 27 (the Dung Property). Map 8 indicates that the easement is 12 feet in width (**Easement**); there is no specific information regarding the scope or intended use of the Easement in Order 5938 or Map 8, except that the map's Notes state that "Lot 28 will have access to Hoonanea Street over Easement 'A'".

3

It appears that the conflict over the Easement began in 2007. Prior to 2007, the Ching Property and the Dung Property were separated by a retaining rock wall, and the Ching Property was not accessible by vehicle over the Easement because of, *inter alia*, a five-foot difference in elevation between the properties. In 2003 or 2004, Ching requested that the Dungs remove the top portion of a retaining wall so that she could create some type of fencing for her dog, which the Dungs did. In 2007, Ching poured a slab, constructed a carport, and constructed a ramp to connect her property to the Easement, so that she was then able to drive from Hoonanea Street to her property using the Easement.

B.   The 2007 Litigation

On June 21, 2007, Ching filed a Complaint (**2007 Complaint**) against a number of the Dungs alleging, *inter alia*, that they had blocked her access to the Easement and through various means had interrupted her use and enjoyment of the Easement (**the 2007 Suit**). Ching sought injunctive relief and damages in the 2007 Suit.

The Dungs filed an Answer to the 2007 Complaint (**2007 Answer**) and a Counterclaim asserting nine counts, including claims for declaratory relief, negligence, nuisance, trespass, and malicious, wanton and intentional actions.

As relevant to the Circuit Court's ruling on judicial admissions (discussed below), the 2007 Complaint alleged:

> 13.   The Easement is necessary due to the fact that Plaintiff's Lot (Tax Map Key No. (1) 2-8-014:074) is land-locked, and the only legally enforceable means of ingress and egress to Plaintiff's lot from Hoonanea Street, is through an easement over Defendants' Lot (Tax Map Key No. (1) 2-8-014:091). True and correct copies of the Tax Maps covering the area in question together with enlargements of

the specific lots are collectively attached hereto as Exhibit B and made a part hereof.

. . . .

18. Defendants would not agree to allow Plaintiff access to her property through use of the Easement, causing delay to Plaintiff's construction work.

In their 2007 Answer, the Dungs' response included:

5. The Defendants admit the allegations contained in Paragraph 13 as to the existence of an easement, and are without sufficient knowledge or information sufficient to admit or to deny the rest of the allegations in said paragraph.

6. All of the answers are to take into consideration the fact that the Defendants have always fully accepted the idea of an easement for ingress and egress consistent with the easement described in the applicable Land Court documents with two exceptions: (a) at the point where the easement joins Hoonanea Street, the utility company and the county had erected a pole and signs that prevented access to the easement without trespassing onto the property of the Defendants. See Exhibit "A". Defendants had earlier advised the Plaintiff's family of their objection to any trespass of their property and the obligation of the Plaintiffs to clear their entry to the easement by working with the County and the utility company (See Exhibit "G"); (b) the fact that while the easement was for access and the reasonable loading and unloading of material from the Plaintiffs' property, it did not allow the parking of vehicles or the placing of stationary material on the easement so as to interfere with the Defendant's use of the easement after the actual loading and unloading were accomplished.

7. The utility pole [] was never removed and the county sign was not removed until May 30, 2007.

8. With regard to the allegations contained in Paragraph 14-15 of the Complaint, the Defendants admit the existence of Land Court Order No. 5938, filed September 29, 1944, in the Officer [sic] of Assistant Registrar, Land Court, State of Hawaii ("Land Court Order") and that such document speaks for itself, and on that basis, the Defendants deny Plaintiff Ching's characterization thereof and denies all other allegations.

9. With regard to the allegations contained in Paragraph 18 of the Complaint, Defendant Annette admits that she informed Plaintiff Ching and/or her representative that the subject easement area was for ingress and egress only and that Plaintiff was not permitted to block the easement area by indefinitely parking vehicles or leaving material on the easement that would prevent the Defendants from using that same easement. Defendant Annette advised Plaintiff that loading and unloading was fine as long as what was loaded or unloaded was from the Plaintiff's property and there was no trespass upon the Defendants' property. Defendants had always insisted that the Plaintiffs take care of business with the County and the utility company first so that there would be no trespass upon their property. Finally, the Complaint in this matter was filed on June 21,

2007, and on that same date, counsel for the Defendants submitted a letter to counsel for Plaintiffs explaining why the Complaint and motion for temporary restraining order should not have been filed. This letter is attached as Exhibit "B" and states in pertinent part:

> It is unfortunate the complaint was filed. I was only recently asked by Mrs. Dung to explain the situation to her as to the rights of the Chings and their easement and had we communicated earlier, I doubt that any of this would have happened. Her actions were not in any way malicious, but taken in view of what she thought her rights to be; she was concerned at times that trucks were parked on the easement preventing her from getting into her garage. I have explained the complaint and the TRO requesting injunctive relief to Annette. With regard to the injunctive relief requested, Mrs. Dung agrees for the land owners that what is being requested is consistent with what her understanding is at this time and that there is no need to request injunctive relief through the Courts. The only point that may be in question is the ability to park on the easement as the easement is one that can be used by both the land owners and the Chings. I have advised Mrs. Dung and she agrees that parking is within the use of an ingress and egress easement if it is for the purposes of loading and unloading; but the easement is not an unlimited easement for unlimited parking by either side.

The parties agree the 2007 Suit was informally resolved and no further action was taken, but the case remained pending in the Circuit Court.

C.    2013 Litigation

Following the informal resolution of the 2007 Suit, conflict persisted between the parties regarding the Easement. On or about June 20, 2013, Annette sought a temporary restraining order and injunction against Ching, which was granted by the District Court of the First Circuit (District Court), which found clear and convincing evidence of harassment by Ching. The District Court issued an Injunction Against Harassment (Injunction) that provided that Ching was restrained from entering Annette's driveway except for the sole purpose of non-

stop access between Ching's residence and Hoonanea Street for a period of three years.[2]

On or about November 1, 2013, Ching filed a complaint in a second lawsuit against the Dungs, asserting numerous claims (**the 2013 Suit**), which was subsequently amended on May 27, 2015.[3] The Dungs filed an Answer to the Amended Complaint and a Counterclaim, which sought, *inter alia*, declaratory and injunctive relief.[4] The Dungs sought a declaration that Ching has "no rights[,] titles, estates, liens or interests superior to [the Dungs'] right to the quiet enjoyment of their own driveway" and they sought an order "declaring that Ching's purported easement is null and void and of no legal force and effect."

On January 8, 2015, the 2007 Suit and the 2013 Suit were consolidated.

D.  Certain Pre-Trial, Trial, and Post-Trial Matters

On January 25, 2016, the Circuit Court held a pre-trial hearing to address, among other things, how the court would proceed with respect to the legal and equitable claims in the case, tried by a jury and the court, respectively.  In an Order Regarding Priority of Issues Adjudicated at [the] January 25, 2016 Hearing (**Judicial Admissions Order**), entered on January 26,

---

[2]      The grant of the Injunction was affirmed by this court in Dung v. Ching, No. CAAP-14-0000425, 2015 WL 3936910 (Haw. App. June 25, 2015) (SDO).

[3]      As amended, Ching asserted twelve claims, including:  (1) Easement by Grant; (2) Easement by Necessity; (3) Easement by Estoppel; (4) Declaratory Relief; (5) Injunctive Relief; (6) Constructive Trust; (7) Breach of Contract; (8) Invasion of Privacy; (9) Defamation/Slander; (10) Civil Conspiracy; (11) Malicious Prosecution; and (12) Nuisance.

[4]      The Dung Defendants asserted six claims, including:  (1) Abuse of Process; (2) Malicious Prosecution; (3) Trespass; (4) Assault and Battery; (5) Intentional Infliction of Emotional Distress; and (6) Declaratory and Injunctive Relief.

2016, the Circuit Court included the following orders and findings:

> IT IS HEREBY ORDERED that the court finds and concludes that the terms and conditions of the easement in question are issues of fact for the jury to determine.
>
> However, the court further finds and concludes that the defendants have judicially admitted the following facts in their answer to complaint filed herein on October 5, 2007:
>
> 1. The existence of the subject easement.
>
> 2. The purpose of the subject easement is for ingress and egress consistent with the easement described in the applicable land court documents with the following exception: the fact that the easement is for access and the reasonable loading and unloading of material from the plaintiff's property, it did not allow the parking of vehicles or the placing of stationary material on the easement so as to interfere with the defendants' use of the easement after the actual loading and unloading were accomplished.
>
> 3. The subject easement could be used for vehicular ingress and egress and loading and unloading of property from plaintiff's property.
>
> Defendants, and each of them, are estopped from denying any or all of the above-stated judicially admitted facts.

Also prior to trial, the Circuit Court limited the proposed testimony of the Dungs' proposed expert, Mr. Robert Bruce Graham, Jr. (**Mr. Graham**), an attorney and law professor specializing in real property and land title matters. The Dungs sought to have Mr. Graham testify regarding matters pertaining to the scope of the Easement at its creation, specifically that it was likely intended to be a "paper easement" and not intended for actual use. The Circuit Court issued its Order Granting in Part and Denying in Part [Ching's] Motion in Limine No. 7 to Strike the Testimony of Robert Bruce Graham, Jr. (**Order Striking Graham's Testimony**), ordering that Mr. Graham could testify regarding "consolidation" and "re-subdivision" but he would not

be allowed to testify about the law *per se* or provide any other opinion testimony.

A jury trial commenced on February 16, 2016, and concluded on March 8, 2016. On March 3, 2016, the Dungs filed a motion for JMOL, which sought the dismissal of a number of claims against a number of individual defendants. Relevant to this appeal, the Dungs sought the dismissal of the counts for nuisance, invasion of privacy, defamation, conspiracy, and malicious prosecution. The Circuit Court denied the Dungs' request to dismiss the nuisance, invasion of privacy, defamation, conspiracy, and malicious prosecution counts as to certain defendants and the jury was instructed that it could find in favor of Ching on these claims.

The jury entered a special verdict in which the jury found that the Easement was for both pedestrian and vehicular use. The jury also concluded that Ching had proved her claims for (1) civil conspiracy, (2) nuisance, (3) invasion of privacy, (4) defamation, and (5) malicious prosecution. The jury awarded Ching special damages of $16,600, general damages of $500,000, and punitive damages of $100,000. The jury decided against the Dungs on all counterclaims.

Following trial, the Circuit Court issued a ruling denying both Ching's and the Dungs' requests for equitable relief, because the court found both sides had "unclean hands." The Circuit Court entered the Final Judgment on September 15, 2016.

The Dungs filed a Motion for New Trial or Remittitur on September 23, 2016. They also filed a Renewed Motion for

Judgment as a Matter of Law on September 26, 2016. Both motions were denied on January 4, 2017, when the Circuit Court entered the Order Denying Further JMOL and the Order Denying New Trial. Ching filed a Motion for Additur or New Trial on September 6, 2016 (**Motion for Additur or New Trial**). After a hearing, the Circuit Court entered the Order Denying Additur on November 14, 2016.

Ching and the Dungs now appeal.

II. POINTS OF ERROR

The Dungs raise four points of error on appeal, contending that the Circuit Court erred by: (1) applying the principle of "judicial admissions" and ruling that the Dungs were estopped from denying that the Easement could be used for vehicular ingress and egress; (2) refusing to allow the Dungs' expert to testify regarding the scope of the Easement; (3) refusing to allow evidence of the District Court's Injunction and the finding that Ching engaged in harassment as defined by HRS § 604-10.5; and (4) allowing the jury to deliberate, despite the lack of sufficient evidence, on Ching's claims of nuisance, invasion of privacy, defamation, malicious prosecution, and entitlement to punitive damages. Further, the Dungs challenge the general and punitive damages awarded to Ching.

Ching asserts two points of error, arguing that the Circuit Court abused its discretion: (1) by not allowing her to present evidence to the jury of the attorneys' fees and the costs that she incurred, as part of her claim for punitive damages; and (2) when it determined that Ching would not be competent to testify as to the reasonableness and necessity of the fees and

10

costs that she incurred in this matter and that she would need an expert witness to testify to the same.

III. APPLICABLE STANDARDS OF REVIEW

A circuit court's determination that a party has made a judicial admission is reviewed *de novo*. See, e.g., Wells Fargo Bank, N.A. v. Omiya, 142 Hawai'i 439, 454, 420 P.3d 370, 385 (2018); Lee v. Puamana Cmty. Ass'n, 109 Hawai'i 561, 573-74, 128 P.3d 874, 886-87 (2006). The determination of whether a party's statement is sufficiently unequivocal to be considered a judicial admission is also a question of law reviewed *de novo*. See 29A Am. Jur. 2d Evidence § 767 (citation omitted).

"[W]hether a witness qualifies as an expert is a matter addressed to the sound discretion of the trial court, and such determination will not be overturned unless there is a clear abuse of discretion." Larsen v. State Sav. & Loan Ass'n, 64 Haw. 302, 304, 640 P.2d 286, 288 (1982) (citations omitted). "In applying [HRE Rule 702], the trial court must determine whether the expert's testimony is (1) relevant, and (2) reliable." Ass'n of Apt. Owners of Wailea Elua v. Wailea Resort Co., 100 Hawai'i 97, 117, 58 P.3d 608, 628 (2002) (citation omitted). "The trial court's relevancy decision under HRE 702 is reviewed *de novo*." State v. Keaweehu, 110 Hawai'i 129, 137, 129 P.3d 1157, 1165 (App. 2006) (citation omitted). "The trial court's determination as to reliability is reviewed under the abuse of discretion standard." Wailea Elua, 100 Hawai'i at 117, 58 P.3d at 628 (citation omitted).

A trial court's ruling on a motion for judgment as a matter of law is reviewed *de novo*. Miyamoto v. Lum, 104 Hawai'i 1, 6-7, 84 P.3d 509, 514-15 (2004) (citing In re

11

> Estate of Herbert, 90 Hawai'i 443, 454, 979 P.2d 39, 50
> (1999)). "A [motion for judgment as a matter of law] may be
> granted only when after disregarding conflicting evidence,
> giving to the non-moving party's evidence all the value to
> which it is legally entitled, and indulging every legitimate
> inference which may be drawn from the evidence in the
> non-moving party's favor, it can be said that there is no
> evidence to support a jury verdict in his or her favor."
> Id. at 7, 84 P.3d at 515 (block quote formatted omitted)
> (quoting Tabieros v. Clark Equipment Co., 85 Hawai'i 336,
> 350, 944 P.2d 1279, 1293 (1997)).

Ray v. Kapiolani Med. Specialists, 125 Hawai'i 253, 261, 259 P.3d

569, 577 (2011).

"Both the grant and the denial of a motion for new

trial is within the trial court's discretion, and [the appellate

court] will not reverse that decision absent a clear abuse of

discretion." Kawamata Farms, Inc. v. United Agri Prods., 86

Hawai'i 214, 251, 948 P.2d 1055, 1092 (1997) (citation and

internal quotation marks omitted). "A court abuses its

discretion whenever it exceeds the bounds of reason or disregards

rules or principles of law or practice to the substantial

detriment of a party." Abastillas v. Kekona, 87 Hawai'i 446,

449, 958 P.2d 1136, 1139 (1998) (citation, internal quotation

marks, and ellipsis omitted).

"Generally, we do not disturb the findings of the trial

court on the issue of damages absent a clearly erroneous measure

of damages." Castro v. Melchor, 142 Hawai'i 1, 16, 414 P.3d 53,

68 (2018) (citations omitted).

Regarding punitive damages, the "[a]ward or denial of

punitive damages is within the sound discretion of the trier of

fact" and "[a]bsent a clear abuse of discretion, we will not

reverse a trier of fact's decision to grant or deny punitive

12

damages." Ditto v. McCurdy, 86 Hawai'i 84, 91, 947 P.2d 952, 959 (1997) (citations omitted).

IV.   DISCUSSION

A.   The Judicial Admissions

The Dungs contend that the Circuit Court erred when it entered the Judicial Admissions Order and ruled, inter alia, that the Dungs were estopped from denying that the Easement could be used for vehicular ingress and egress.

"A judicial admission is 'a formal statement, either by [a] party or his or her attorney, in [the] course of [a] judicial proceeding [that] removes an admitted fact from [the] field of controversy.  It is a voluntary concession of fact by a party or a party's attorney during judicial proceedings.'" Lee, 109 Hawai'i at 573, 128 P.3d at 886 (quoting 29A Am. Jur. 2d Evidence § 770, at 137 (1994) (footnotes omitted)).[5]

> A judicial admission is a deliberate, clear, unequivocal statement of a party about a concrete fact within that party's knowledge, not a matter of law.  In order to constitute a judicial admission, the statement must be one of fact, not opinion. . . .  Where the testimony of the party relates, not to a fact peculiarly within his or her own knowledge and as to which the party could not be mistaken, but is in the nature of an estimate or opinion as to which he or she may honestly be mistaken, the party does not unequivocally concede that the fact is in accord with the opinion expressed and there is no injustice in permitting the court to consider the other evidence in the court, and determine from all the evidence what the actual facts are.

29A Am. Jur. 2d Evidence § 767, Westlaw (database updated August 2019) (footnotes omitted).  Thus, in order to constitute a judicial admission, a party's statement must be a clear and unequivocal statement of fact.  Importantly, it must pertain to a

---

[5]   A judicial admission may be made in any number of ways, including in an answer to a complaint.  See generally 29A Am. Jur. 2d Evidence §§ 767, 768.

concrete fact within the party's knowledge, not simply the party's opinion, belief, or estimation. As suggested by the above, absent an unequivocal admission concerning such a fact, it is in the interest of justice to allow the trier of fact to consider other admissible evidence before determining the question of fact. This approach is consistent with long-standing Hawai'i rules and jurisprudence governing pleadings, which counsel liberal interpretation and construction fostering substantial justice. See, e.g., Hawai'i Rules of Civil Procedure (**HRCP**) Rule 8(f) ("All pleadings shall be so construed as to do substantial justice."); Au v. Au, 63 Haw. 210, 221, 626 P.2d 173, 181 (1981) ("We repeatedly have said that the Rules of Civil Procedure were not meant to be a game of skill where one misstep by counsel would be decisive to the outcome.") (citations omitted).

In this case, statements in the 2007 Answer were deemed to constitute judicial admissions as to the scope of the Easement. To determine the scope of an easement, the intent of the *original* party or parties to the easement - *i.e.*, the parties when the easement was granted - governs the determination of the scope of the easement, and we must first look to the document granting the easement to glean that intent. See Restatement (Third) of Property: Servitudes § 4.1 (2000), Westlaw (database updated June 2019) (**Restatement of Property**) ("[a] servitude should be interpreted to give effect to the intention of the parties ascertained from the language used in the instrument").

Here, as quoted above, in the 2007 Answer, the Dungs state that they, the defendants in the 2007 Suit, have "always

14

fully accepted the idea of an easement for ingress and egress" consistent with Order 5938, with certain exceptions. First, this is a statement of the Dungs' acceptance of an idea of an easement for ingress and egress, perhaps referencing what in their opinion is permissible under the Easement. It is not a statement of a "concrete fact" regarding the scope of the Easement. The Judicial Admissions Order takes this "acceptance of an idea" and converts it into an unchallengeable finding as to the scope of the Easement. In addition, the Dungs' statement is not an admission concerning the intent of the original parties to the Easement's creation, as the Dungs were not parties to the creation of the Easement and there is nothing in the 2007 Answer otherwise supporting that the intent of the original parties was within the Dungs' knowledge. The somewhat rambling answers to allegations of the 2007 Complaint, read as a whole, are more fairly read as a long-winded explanation of the Dungs' positions, actions, and grievances with respect to the Easement – an attempt to characterize their actions as reasonable and accommodating and the actions of Ching as unreasonable and burdensome. While perhaps inartfully drafted, we cannot conclude that these statements are sufficiently clear, deliberate, and unequivocal that they should be decisive to the outcome of an issue that is so central to the dispute between the parties that it does substantial justice to estop the Dungs from denying or presenting contrary evidence as to the permissible use of the Easement pursuant to Order 5938.

Moreover, Order 5938 provides that it authorized and approved "the Petition stating that Lot 28 [the Ching Property]

15

will have access to Hoonanea Street over Easement 'A'." Attached to Order 5938 is Map 8 that identifies "Easement A" that runs along the edge of the Dung Property and indicates that the easement is 12 feet in width. There is no additional information regarding the scope or intended use of the Easement. As such, it is apparent that from the records documenting the creation of the Easement that its intended use and scope is ambiguous. See, e.g., Polumbo v. Gomes, CAAP-13-0003145, 2018 WL 1082986, *6 (Haw. App. Feb. 28, 2018) (mem. op.) (easement is ambiguous where it provides the width and use of the easement but failed to state whether owners of servient estate could place gates over the easement); see also Dethlefsen v. Weddle, 284 P.3d 452, 459-60 (N.M. Ct. App. 2012) (holding that the scope of an easement, described as a fifty-foot wide road easement to and across said property as shown on a specified plat, was ambiguous).

> Where the scope of an easement is ambiguous,
>
> courts look to the intent of the parties creating the easement. An easement should be interpreted to give effect to the intention of the parties who created it to carry out the purpose for which it was created, as ascertained from the language of instrument and the circumstances surrounding its creation.

Polumbo, 2018 WL 1082986 at *6 (citing Restatement of Property § 4.1). Questions of intent are ultimately questions of fact for the trier of fact to resolve. See, e.g., Childs v. Harada, 130 Hawai'i 387, 397, 311 P.3d 710, 720 (App. 2013) (abandonment of easement is a question of intent and for trier of fact to resolve).

The Circuit Court in its Judicial Admissions Order expressly stated that the Dungs had made certain admissions with

respect to the Easement in the 2007 Answer. The Circuit Court concluded that the Dungs had judicially admitted:

1.   The existence of the subject easement.

2.   The purpose of the subject easement is for ingress and egress consistent with the easement described in the applicable land court documents with the following exception: the fact that the easement is for access and the reasonable loading and unloading of material from the plaintiff's property, it did not allow the parking of vehicles or the placing of stationary material on the easement so as to interfere with the defendants' use of the easement after the actual loading and unloading were accomplished.

3.   The subject easement could be used for vehicular ingress and egress and loading and unloading of property from plaintiff's property.

Incongruously, the instructions to the jury informed the jury that its duty was to decide whether Ching was permitted pedestrian access, vehicular access, or both, and in its Special Verdict Instructions the jury was in fact asked:

Question 1: Which of the following use or uses are permitted over the 12 foot wide easement?
A.   For pedestrian use.
B.   For vehicular use.
C.   For both pedestrian and vehicular use.

However, this court's review of the record shows, and both parties on appeal agree, that the Circuit Court concluded that the Dungs had judicially admitted that the scope of the Easement included vehicular access and, therefore, that question of fact was taken outside of the scope of controversy for the purposes of trial.

On appeal, the Dungs do not deny the existence of the Easement. The Dungs argue that the Circuit Court erred regarding its conclusion that they had made judicial admissions as to the scope of the Easement, specifically that the scope of the Easement included vehicular ingress and egress. This argument

has merit. As we explained above, the scope of the Easement is ambiguous. The documents granting the Easement state that "Lot 28 [Ching's lot] will have access to Hoonanea Street over Easement 'A'," but are silent with respect to the nature of that access and anything else, other than its length and width. When faced with such an ambiguity, the duty of the court is to then determine the intent of the Easement's creator by looking to extrinsic evidence, such as the circumstances surrounding its creation. See Polumbo, 2018 WL 1082986 at *6.

In sum, the Dungs did not create the Easement, and the scope of the Easement was not "a concrete fact within [their] knowledge." See 29A Am. Jur. 2d Evidence § 767. In addition, the "admission" relied upon by the Circuit Court regarding the Easement's scope is not "unequivocal." See id. Rather, the Dungs in their 2007 Answer, inartfully stated that they "fully accepted the idea of an easement for ingress and egress consistent with the easement described in the applicable Land Court documents," but then identified exceptions. This does not constitute an "unequivocal concession of the truth" of a "concrete fact within [the Dungs'] knowledge." See id. The statements in the 2007 Answer can be fairly characterized only as the position of the Dungs with respect to the purpose and scope of the Easement in the 2007 Matter. We conclude that the Circuit Court erred in concluding that the Dungs had made judicial admissions regarding the scope and permissible use of the Easement and in estopping the Dungs from denying that scope and use, as well as estopping them from presenting evidence concerning the scope of the Easement.

18

B.    Excluded Expert Testimony

Relatedly, the Dungs argue that the Circuit Court erred by refusing to allow the Dungs' expert to testify regarding the intended scope of the Easement.  As discussed above, when an easement is ambiguous as to its scope, the next step is to look to the intent of the parties who created the easement to give effect to their intention as ascertained by the circumstances surrounding the easement's creation.  See Polumbo, 2018 WL 1082986 at *6; Restatement of Property § 4.1.

The Dungs sought to admit the testimony of their expert, Mr. Graham, who reportedly would have testified that the circumstances surrounding the creation of the Easement support a conclusion that it was created as a "paper easement."  Mr. Graham was prepared to testify that the Easement was likely created in response to the City Planning Commission's recommendation, in order to obtain approval of a proposed subdivision, as the Commission had a policy against creating landlocked parcels.  The Dungs argue that the jury could infer, from Mr. Graham's proposed testimony, that it was not the intent of the Easement's creator to allow vehicular access over the Easement.  Mr. Graham's testimony was to have been supported by reference to the steep grade or drop at or near where the Easement abutted Ching's lot, limiting any practical means of vehicular access at the time the Easement was created.  Mr. Graham was also prepared to testify, inter alia, that in the 1940s, when the Easement was created, many Honolulu residences had no garage or carport and immediate vehicular access was not necessary for their use and enjoyment, as well as concerning "practical access" from Ching's lot to

19

Wilder Avenue, which access was later formalized. Based upon these circumstances, as well as the nature of Land Court easements (which Mr. Graham was intended to address), Mr. Graham's opinion was that the Easement was merely a paper easement and that it remained for Mary Ching, as the owner of both the dominant and subservient lots, to subsequently specify by specific grant the scope of Easement A, as well as terms and conditions. The Circuit Court in its pre-trial ruling decided that it would only permit Mr. Graham to educate the jury about "consolidation" and "re-subdivision", but excluded all other opinion testimony.

It is unclear what testimony would be encompassed in Mr. Graham's testimony regarding "consolidation" and "re-subdivision." However, all parties to this appeal acknowledge that Mr. Graham's testimony outlined above would have been excluded. The Circuit Court reiterated during trial that Mr. Graham's testimony would be limited to those two issues and he would not be able to assist the jury as to "any fact in issue in this case."

At the time the Circuit Court made its decision to limit Mr. Graham's testimony, it had already concluded that the Dungs had judicially admitted critical facts regarding the Easement's scope, which undoubtedly impacted the court's assessment as to whether Mr. Graham's testimony should be admitted at trial. Insofar as Mr. Graham's testimony was excluded by the Circuit Court's Order Striking Graham's Testimony because the scope of the Easement was taken out of controversy, it was excluded in error and the order is vacated. On remand,

the Circuit Court will have an opportunity to reconsider whether the Dungs' expert's proposed testimony meets the standards for expert testimony and would provide relevant evidence regarding, *inter alia*, the scope of the Easement.

C.     The District Court Injunction

The Dungs argue that the Circuit Court erred when it ruled, *inter alia*, on February 17, 2016:

> Any reference to other judges' rulings, that is . . . Judge Kawashima at the district court[,] will be responded to by this court by severe sanctions, either monetary or otherwise.  I have to see what the circumstances are.  But I already told counsel there will be no reference to a district court adjudication or any other determination.

It appears that in this statement, the Circuit Court emphasized that it would not allow evidence of the District Court's Injunction and the District Court's finding that Ching engaged in harassment as defined by Hawaii Revised Statutes **(HRS)** § 604-10.5 (2016).[6]

However, it further appears that, days earlier, the Circuit Court ruled to the contrary, in response to the parties'

---

[6]     HRS § 604-10.5 provides, in relevant part:

> **§ 604-10.5 Power to enjoin and temporarily restrain harassment.**  (a) For the purposes of this section:
> "Course of conduct" means a pattern of conduct composed of a series of acts over any period of time evidencing a continuity of purpose.
> "Harassment" means:
> (1)     Physical harm, bodily injury, assault, or the threat of imminent physical harm, bodily injury, or assault; or
> (2)     An intentional or knowing course of conduct directed at an individual that seriously alarms or disturbs consistently or continually bothers the individual and serves no legitimate purpose; provided that such course of conduct would cause a reasonable person to suffer emotional distress.
> (b) The district courts shall have the power to enjoin, prohibit, or temporarily restrain harassment.
> (c) Any person who has been subjected to harassment may petition the district court of the district in which the petitioner resides for a temporary restraining order and an injunction from further harassment.

motions *in limine*. Ching's Motion in Limine No. 1 sought "an order that precludes any and all testimony that refers to the [Injunction], the hearing on the Injunction, and any evidence presented at the hearing." The Dungs' Motion in Limine No. 1 sought "an order stating that the issue of [Ching's] misuse of the subject easement has already been adjudicated and therefore Hawai'i law principles of collateral estoppel . . . apply." After the Circuit Court announced its inclination, entertained argument, and engaged in spirited discourse with counsel, the court announced its rulings:

> [Ching's] Motion in Limine No. 1 is denied. Judge Kawashima's findings of harassment are based on clear and convincing evidence after a trial -- a three-day trial on the merits. The findings appear to be intended as a final adjudication on the merits. The findings are sufficiently firm, and there is no indication expressed that -- by the Court of any intention that future litigation on the issue of harassment of Annette Dung by Donna Ching should not be collaterally estopped. So for these and any other good cause shown in the record, the Court will deny [Ching's] Motion in Limine No. 1.
> The Court will also grant [Dungs'] Motion in Limine No. 1, however, this phrase, quote, "easement abuse," end quote, will not be permitted. That is a characterization by Judge Kawashima almost as an afterthought and is not a finding of fact. The Court will restrict the evidence to the determinations of Judge Kawashima through the date of the injunction that was issued.
> If the defense can show this court legal authority to support the contention that they should be able to submit new evidence of additional acts of harassment or in the nature of harassment that occurred after the issuance of the restraining order, . . . I'll be open to seeing any legal authority on that point.

Post-trial, on August 4, 2016, the Circuit Court entered written orders memorializing these rulings.

During trial, the issue of how the Dungs could characterize and admit into evidence the District Court's "order" with respect to Ching and the Easement arose. The Dungs requested clarification on the court's previous decision that the Dungs could reference the District Court's previous "order" but

not the term "injunction" and could not admit the Injunction into evidence. The Circuit Court stated that the court did not recall foreclosing the use of the word "injunction." Further, the court explained that multiple witnesses had talked about injunctions so the objection to the admission of the Injunction might be waived.[7] The court acknowledged that a preliminary injunction in favor of Ching and against the Dungs had already been admitted into evidence. However, the court declined to rule at that point on whether the Injunction could be admitted because the Injunction had not yet been identified and offered for admission into evidence, for example, through a witness.

The issue again arose when the Dungs tried to introduce the Injunction itself into evidence. Notwithstanding the admission of a somewhat similar order in favor of Ching and against the Dungs, the Circuit Court concluded, *inter alia*, that admitting the Injunction into evidence would result in undue prejudice to Ching as the jurors could conclude based on the District Court's adjudication that Ching "must be guilty of everything."

The Dungs argue on appeal that Ching submitted evidence of numerous instances where the Dungs called the police and that they were prejudiced by their inability to submit as evidence the three-year Injunction because without it the jury was left to believe the Dungs had been unreasonable in their calls to the

---

[7] References were made to the Injunction at trial. For example, evidence of the Facebook entry referencing the "three-year restraining order" was admitted at trial and testimony was given with respect thereto. A recording of a 911 call was played at trial in which one of the Dungs referenced having a "TRO against [Ching]" and then identified that it was an "[i]njunction."

police for assistance.[8]   In addition to, *inter alia*, the finding
that Ching committed harassment and the order that she was
restrained from particular actions including "[e]ntering or
visiting [the Dung] residence, including yard, driveway and
garage, except for the sole purpose of non-stop access between
Hoonanea Street and [Ching's residence]" for three years, the
Injunction states that "THE POLICE SHALL ENFORCE THIS INJUNCTION
ORDER."

Significantly, one of the claims asserted by Ching
against a number of the Dungs was a claim for nuisance, alleging
that they "deliberately and significantly interfered with . . .
the Easement" and "deliberately and improperly sought to prevent
[Ching] from using the Easement and to punish her for using the
Easement."  Ching alleged in her Counterclaim that the Dungs
repeatedly called the Honolulu Police Department (**HPD**) after the
District Court issued the Injunction and improperly used the
Injunction to prevent her from using the Easement; Ching
presented evidence at trial concerning the Dungs' calls to the
police.

We conclude, and it appears that the Circuit Court
agreed, that the Injunction was relevant at trial.  There was a
judicial finding in a previous action that Ching had harassed
Annette and the Injunction was to be enforced by the HPD.  The
enforcement of the Injunction was a basis for Ching's nuisance
claim and was critical to explain (and perhaps justify) why the

---

        [8]    The Dungs raised this issue below, at the February 17, 2016 pre-
trial hearing and during trial, when the Dungs attempted to admit the
Injunction into evidence and the Circuit Court sustained Ching's objection to
its admission.

Dungs called the HPD to report various actions of Ching that they believed violated the Injunction. The Circuit Court, however, found that the introduction of evidence regarding the prior adjudication and entering into evidence the Injunction itself would be unduly prejudicial to Ching.

Pursuant to Hawaiʻi Rules of Evidence (**HRE**) Rule 403 (2016),[9] relevant evidence should be admitted unless the probative value is substantially outweighed by its undue prejudicial effect.

> "Probative evidence always 'prejudices' the party against whom it is offered since it tends to prove the case against that person." State v. Klafta, 73 Haw. 109, 115, 831 P.2d 512, 516 (1992). The commentary to HRE Rule 403 explains that "'[u]nfair prejudice,' as the Advisory Committee's Note to Fed.R.Evid. Rule 403 explains, 'means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" HRE Rule 403, Commentary. In addition, overall considerations in making this determination include the actual need for the evidence, availability of other evidence on the same issues, probative weight of the evidence, and the potential for creating prejudice against the accused in the jurors' minds. State v. Murphy, 59 Haw. 1, 9, 575 P.2d 448, 455 (1978) (discussed in HRE Rule 403 Commentary).

Samson v. Nahulu, 136 Hawaiʻi 415, 430, 363 P.3d 263, 278 (2015).

The Circuit Court ruled that entering into evidence the District Court's Injunction, which stated that Ching had engaged in harassment, would be confusing to the jury and unfairly prejudicial. We conclude that the Circuit Court abused its discretion in doing so. There were numerous instances at trial in which the Injunction was mentioned or referred to by

---

[9]     HRE Rule 403 states:

> **Rule 403   Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.** Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

25

witnesses. For example, the Injunction was mentioned in the Facebook posting that was entered into evidence to support Ching's invasion of privacy claim and testimony with respect thereto was given at trial. The Injunction was critical to understanding why Ching could not stop on the Easement and is highly relevant to the issue of whether the Dungs' calls to the HPD were a nuisance. While we recognize the Circuit Court's concern regarding informing the jury of the District Court's previous finding of harassment, in light of all of the issues and circumstances in this case, including the admission into evidence of Preliminary Injunction in favor of Ching' and against the Dungs, we conclude that the Circuit Court abused its discretion in refusing to admit into evidence the Injunction.[10]

D. The Order re JMOL

The Dungs contend that the Circuit Court erred in denying JMOL and rejecting their request for a new trial, on numerous grounds. We will address each of the Dungs' arguments.

1. Nuisance

The Dungs argue that there was insufficient evidence at trial to submit Ching's nuisance cause of action to the jury.

> A nuisance has been variously defined to mean "that which unlawfully annoys or does damage to another, anything that works hurt, inconvenience, or damage, anything which annoys or disturbs one in the free use, possession, or enjoyment of his property or which renders its ordinary use or physical occupation uncomfortable, and anything wrongfully done or permitted which injures or annoys another in the enjoyment of his legal rights."

Littleton v. State, 66 Haw. 55, 67, 656 P.2d 1336, 1344 (1982)

---

[10] A curative instruction could be crafted to address concerns regarding prejudice.

(quoting 58 Am. Jur. 2d <u>Nuisances</u> § 1 at 555 (1971)). The Restatement of Torts provides:

> One is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is either
>
> (a) intentional and unreasonable, or
>
> (b) unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities.

Restatement (Second) of Torts § 822 (1979) Westlaw (database updated June 2019) (**Restatement of Torts**). An invasion is "unreasonable" if, *inter alia*, "the gravity of the harm outweighs the utility of the actor's conduct." <u>Id.</u> § 826.

The Dungs argue there was insufficient evidence to support a nuisance claim because there was no evidence of "significant harm" to Ching or that the conduct was "contrary to common standards of decency." Significant harm is not required - a claim may be alternatively supported by evidence that the gravity of the harm outweighed the utility of the Dungs' conduct and that the harm is serious. <u>Id.</u> There was evidence presented that could support a jury's verdict that the Dungs intentionally and unreasonably interfered with Ching's use of the Easement, thereby interrupting her enjoyment of her property interest.[11]

The Dungs make no argument regarding the other elements of Ching's nuisance claim. Therefore, we conclude there was sufficient evidence to submit Ching's nuisance claim to the jury.

---

[11] We note that Ching argues that the encroachment of plants onto the Easement from the Dung Property supported her nuisance claim. However, the encroachment of plants without "sensible harm to property" is not sufficient to support a nuisance claim. <u>See</u> <u>Whitesell v. Houlton</u>, 2 Haw. App. 365, 367, 632 P.2d 1077, 1079 (1981).

However, we further conclude that our disposition of the Dungs' first and second points of error require us to vacate the Circuit Court's entry of judgment on the nuisance claim. The Circuit Court's error in its ruling regarding the Dungs' judicial admission of the scope of the Easement is directly relevant. Ching claims that the Dungs interfered with her use and enjoyment of the Easement by, *inter alia*, blocking or attempting to prohibit her vehicular access to the Easement. As explained *supra*, the Dungs were precluded from introducing evidence at trial that the scope of the Easement did not include vehicular ingress or egress due to the Circuit Court's conclusion that the Dungs had judicially admitted that the Easement could be used for vehicular ingress and egress and were estopped from presenting evidence to the contrary. If the Dungs could establish that the scope of the Easement does not include vehicular use, then acts obstructing Ching's vehicular access to the Easement could be considered reasonable and of right.

2. Invasion of Privacy

The Dungs argue that the Circuit Court erred when it entered the Order re JMOL with respect to Ching's claim for invasion of privacy because there was insufficient supporting evidence as a matter of law.

HRCP Rule 50(a)(1) states:

If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

28

Ching alleged, and maintains on appeal, that the Dungs committed the tort of invasion of privacy by: (1) videotaping Ching; (2) yelling derogatory statements about Ching that others could hear; and (3) posting derogatory comments, video, and images about Ching on the social media platform Facebook. Ching submitted to the jury three separate legal theories upon which her invasion of privacy claim was based: (1) intrusion upon seclusion; (2) false-light; and (3) unreasonable publicity. We will address each of these in turn.

Regarding the videotaping, which was the basis of Ching's intrusion upon seclusion claim, the Restatement of Torts § 652B defines the tort of intrusion upon seclusion as:

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

The tort of intrusion upon seclusion does not depend on any publicity but rather "consists solely of an intentional interference with his interest in solitude or seclusion, either as to his person or as to his private affairs or concerns, of a kind that would be highly offensive to a reasonable man." Id. § 652B cmt. a. Regarding "solitude or seclusion," the Restatement of Torts explains:

> The defendant is subject to liability under the rule stated in this Section only when he has intruded into a private place, or has otherwise invaded a private seclusion that the plaintiff has thrown about his person or affairs. Thus there is no liability for the examination of a public record concerning the plaintiff, or of documents that the plaintiff is required to keep and make available for public inspection. Nor is there liability for observing him or even taking his photograph while he is walking on the public highway, since he is not then in seclusion, and his appearance is public and open to the public eye. Even in a public place, however, there may be some matters about the plaintiff, such as his underwear or lack of it, that are not exhibited to the public gaze; and there may still be

invasion of privacy when there is intrusion upon these matters.

Id. cmt. c. The intrusion must be a "substantial one, of a kind that would be highly offensive to the ordinary reasonable man, as the result of conduct to which the reasonable man would strongly object." Id. at cmt. d.

The evidence at trial showed that the Dungs had installed video cameras to capture video of the Dungs' driveway and the Easement. Screen shots from the video were submitted into evidence. There is no evidence in the record that the video cameras captured anything other than what is publicly viewable from the Dungs' home and property. There was also testimony of an instance of one of the Dungs videotaping Ching with a cellular phone as Ching got into her car and drove up the Easement.[12]

We conclude that, giving Ching's evidence all of the value to which it is legally entitled, and indulging every legitimate inference which may be drawn in favor of Ching, there was no evidence at trial to support a jury verdict in favor of Ching on her invasion of privacy claim on the theory of intrusion upon seclusion based on the video-recording of Ching and the Easement. The videos were taken of the Easement and Ching in a public, not a private, place and the recordings were not of anything outside of the public gaze. See Restatement of Torts at § 652B cmt. c; Stinson v. Mensel, No. M2016-00624-COA-R3-CV, 2017 WL 2972219, *6 (Tenn. App. July 12, 2017) (no reasonable expectation of solitude or seclusion on land encompassing an

_____

[12] While not dispositive, it appears that both sides of this dispute videotaped each other on a variety of occasions as Ching offered and the court admitted videos taken by Ching of the Dungs and the Dungs' property.

easement between plaintiffs and defendants). Therefore, the Circuit Court erred in entering the Order re JMOL with respect to the intrusion upon seclusion theory of invasion of privacy and in submitting that theory to the jury.

We next consider Ching's claim that the certain statements yelled by the Dungs, while the Dungs were on their property, were heard by third-parties, and constituted an invasion of privacy under either the theory of "unreasonable publicity" or "false light." The Restatement of Torts defines the unreasonable-publicity tort as follows:

> One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that
>
> > (a) would be highly offensive to a reasonable person, and
> >
> > (b) is not of legitimate concern to the public.

Restatement of Torts § 652D.

The false-light tort is defined as:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
>
> > (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
> >
> > (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

Id. § 652E.

Both the unreasonable publicity and false light theories share the identical requirement of "publicity." See Restatement of Torts §§ 652D cmt. a, 652E cmt. a. Regarding the requirement of "publicity", the Restatement of Torts explains that publicity

> means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge. The difference is not one of the means of communication, which may be oral, written or by any other means. It is one of a communication that reaches, or is sure to reach, the public.
>
> Thus it is not an invasion of the right of privacy, within the rule stated in this Section, to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons. On the other hand, any publication in a newspaper or a magazine, even of small circulation, or in a handbill distributed to a large number of persons, or any broadcast over the radio, or statement made in an address to a large audience, is sufficient to give publicity within the meaning of the term as it is used in this Section. The distinction, in other words, is one between private and public communication.

Restatement of Torts § 652D cmt. a. The commentary further explains that the rule "gives protection only against unreasonable publicity, of a kind highly offensive to the ordinary reasonable man." Id. cmt. c. By way of illustration, the comment helpfully elaborates:

> The protection afforded to the plaintiff's interest in his privacy must be relative to the customs of the time and place, to the occupation of the plaintiff and to the habits of his neighbors and fellow citizens. Complete privacy does not exist in this world except in a desert, and anyone who is not a hermit must expect and endure the ordinary incidents of the community life of which he is a part. Thus he must expect the more or less casual observation of his neighbors as to what he does, and that his comings and goings and his ordinary daily activities, will be described in the press as a matter of casual interest to others. The ordinary reasonable man does not take offense at a report in a newspaper that he has returned from a visit, gone camping in the woods or given a party at his house for his friends. Even minor and moderate annoyance, as for example through public disclosure of the fact that the plaintiff has clumsily fallen downstairs and broken his ankle, is not sufficient to give him a cause of action under the rule stated in this Section. It is only when the publicity given to him is such that a reasonable person would feel justified in feeling seriously aggrieved by it, that the cause of action arises.

Id.

The evidence at trial included testimony from three male visitors of Ching who, on multiple occasions, heard statements referencing Ching that originated from the Dung Property and that a jury could find to constitute unreasonable

publicity or false light if publicized. The nature of statements was that Ching had multiple "guys" to her home that day or that week before the testifying visitor arrived. The statements included crude references to sexual conduct. No neighbors testified, but Ching testified, "[a]nd of course the neighbors can hear."

As stated above, publicity means that the matter is "made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." Id. cmt. a. "[I]t is not an invasion of the right of privacy . . . to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons." Id. Here, the yelled statements emanating from the Dung Property were not communications to the "public at large" or "to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." Id. Thus we conclude, again giving Ching's evidence all of the value to which it is legally entitled, and indulging every legitimate inference which may be drawn in favor of Ching, there was not sufficient evidence at trial of the publicity element necessary to a jury verdict based upon the theories of either unreasonable publicity or false light based on the yelled statements.

Thus, we conclude that there was not sufficient evidence to support an invasion of privacy claim on the theory of intrusion upon seclusion and, therefore, the Circuit Court erred in submitting it to the jury. We also conclude that the evidence related to the Dungs videotaping of Ching and yelling of

33

derogatory statements about Ching did not include evidence of publicity, which is necessary to establish unreasonable publicity or false light, and therefore, that evidence could not support a jury verdict on Ching's invasion of privacy claim.

Ching's remaining theories of invasion of privacy are unreasonable publicity and false light based on the Dungs' Facebook postings. As discussed above, to sustain a claim for invasion of privacy based upon unreasonable publicity, the Restatement of Torts requires that Ching must prove that the Dungs (1) gave publicity, (2) to a matter concerning her private life, (3) if the matter would be regarded as highly offensive to a reasonable person, and (4) is not of legitimate concern to the public. See Restatement of Torts § 652D. On appeal, the Dungs' only contention of error regarding the unreasonable publicity theory pertains to the publicity requirement. To sustain a claim for invasion of privacy based upon false light, Ching must prove that the Dungs (1) gave publicity, (2) to a matter concerning Ching that placed her before the public in a false light, (3) if the false light would be highly offensive to a reasonable person, and (4) the Dungs had knowledge or acted in reckless disregard as to the falsity of the publicized matter and the false light. See Wilson v. Freitas, 121 Hawaiʻi 120, 130, 214 P.3d 1110, 1120 (App. 2009) (citing Restatement of Torts § 652E).

The evidence at trial showed that a number of the Dungs shared a Facebook page on which they posted video of Ching driving on the Easement, parking her car on Hoonanea Street, and taking a picture of a wire hanging over the driveway. Also admitted into evidence were postings concerning Ching made on the

34

same Facebook page. These postings did not identify Ching by name but described the conflict the Dungs had with Ching regarding the Easement, allegations of harassment, personal details regarding Ching, such as the fact she was a divorcée, and assertions that various men had spent the night at her home. The evidence at trial showed that the offending Facebook page had numerous followers (over 2,000) and was also available to the public at large. With respect to the Facebook postings by the Dungs, we conclude that there was sufficient evidence the publicity requirement is satisfied to support a jury verdict.

The Dungs also argue that the Facebook posts are not actionable as an invasion of privacy because the posts do not actually name Ching. However, the Facebook posts contain video footage of Ching, pictures of Ching and her vehicle, images of Ching's house, and comments about Ching's personal life, such as, "she's had so many different men going up and down. Our driveway. On this morning the guy driving her is not the same one she returned with later that night. . . . He just spent the night." Courts generally require that a plaintiff be reasonably identifiable to support an invasion of privacy claim. See generally David A. Elder, Privacy Torts §§ 3:4, 4:4, Westlaw (updated August 2018); see, e.g., Young v. That Was The Week That Was, 312 F. Supp. 1337, 1341 (N.D. Ohio 1969) ("To sustain an action for invasion of privacy based on the publication of a person's private affairs, one necessary element is the identification of the plaintiff in the publication. If the plaintiff cannot be identified as the person who is the subject of the publication from the published matter itself, then there

has been no actionable invasion of the right of privacy"). Here, we conclude that there was sufficient evidence for a jury to find that Ching's identity was reasonably identifiable from the Dungs' Facebook postings.

Accordingly, based on the evidence in the record, we conclude that there was sufficient evidence of the publication element necessary to a jury verdict, based upon the theories of either unreasonable publicity or false light, based on these Facebook postings.

The Dungs' argument regarding false light also pertains to the publicity requirement. Based upon the Facebook posting evidence, we conclude that the Circuit Court did not err when it entered the Order re JMOL with respect to the unreasonable publicity and false light theories of invasion of privacy as, giving Ching's evidence all the value to which it is entitled and indulging every legitimate inference in Ching's favor, there was sufficient evidence for a jury to find in Ching's favor.

3.    Defamation

The Dungs argue that the Circuit Court erred in allowing the jury to deliberate on Ching's claim for defamation. In order to sustain a claim for defamation, a plaintiff must establish:

> a) a false and defamatory statement concerning
> another;
> b) an unprivileged publication to a third party;
> c) fault amounting at least to negligence on the part of the
> publisher [actual malice where the plaintiff is a public
> figure]; and
> d) either actionability of the statement irrespective of
> special harm or the existence of special harm caused by the
> publication.

Nakamoto v. Kawauchi, 142 Hawai'i 259, 270, 418 P.3d 600, 611 (2018) (quoting Restatement of Torts § 588).

The Dungs argue that the testimony of Matthew Oney (**Oney**) and Ernest Lee (**Lee**) could not support a claim of defamation because their testimony regarding the meaning of the statements they overheard was speculative and based on assumptions. Upon review, the Dungs did not raise any objection or seek to strike this testimony on these grounds. Moreover, the Dungs do not acknowledge the testimony of another witness who also testified to hearing crude statements regarding Ching, John Hoogsteden (**Hoogsteden**). Hoogsteden testified that he heard female voices from the Dung residence on multiple occasions make crude sexual and other malicious statements and innuendos about Ching.[13] We conclude that the Dungs' argument is without merit.

The Dungs make no other argument that there was insufficient evidence to support Ching's claim for defamation. We therefore conclude there was evidence presented warranting the submission of the defamation claim to the jury.

4. Malicious Prosecution

The Dungs argue that the Circuit Court erred in denying their motion for JMOL as to Ching's malicious prosecution claims. "The tort of malicious prosecution permits a plaintiff to recover when the plaintiff shows that the prior proceedings were (1) terminated in the plaintiff's favor, (2) initiated without

---

[13] For example, Hoogsteden testified that he heard, "The other guy just left. He's the fifth guy here this week. She was totally making out with the other guy. Oh, that's the guy with the STD. Oh, no shame. I guess he just wants to stick it in the hole. And comments like that." He stated that he heard comments like that "at least a dozen times, probably more like 20 to 40 times" in a period of about six months.

probable cause, and (3) initiated with malice." Young v. Allstate Ins. Co., 119 Hawai'i 403, 417, 198 P.3d 666, 680 (2008) (citations omitted).

Ching alleged two instances of malicious prosecution. The first allegedly occurred after Ching stopped her vehicle at the top of the Easement, got out, and took a photograph of what she believed were encroachments upon the Easement. At that time, the Injunction was in effect and provided that Ching could not stop on the Easement and could only use it for non-stop access to her residence. The Dungs called the police, and Ching was arrested for harassment. Ching testified that, at the court hearing she attended with counsel, the prosecutor "downgraded" the charge to a parking citation to which Ching pleaded guilty; later in her testimony she agreed that she "eventually acknowledged or pled to a parking violation."

As the Dungs argue, it is generally held that "the termination of a criminal prosecution as a result of the accused's settlement or compromise of civil liabilities arising out of the same acts precludes a subsequent malicious prosecution claim by the accused, the termination being viewed as unfavorable to the accused." 52 Am. Jur. 2d Malicious Prosecution § 38, Westlaw (database updated August 2019) (footnotes omitted) (citing Lawson v. N.Y. Billiards Corp., 331 F. Supp. 2d 121 (E.D. N.Y. 2004) (applying New York law); Cantalino v. Danner, 754 N.E.2d 164 (N.Y. 2001)); see also Restatement of Torts § 660 (no claim for malicious prosecution may be made where "the charge is

withdrawn or the prosecution abandoned pursuant to an agreement of compromise with the accused"). The commentary to the Restatement of Torts explains that "[a]lthough the accused by his acceptance of a compromise does not admit his guilt, the fact of compromise indicates that the question of his guilt or innocence is left open. Having bought peace the accused may not thereafter assert that the proceedings have terminated in his favor." Id. cmt. c. We agree with this proposition, and therefore conclude that the Dungs' argument that this instance could not have supported a claim for malicious prosecution has merit.

The second alleged instance of malicious prosecution arose out of an incident that occurred while Ching was watering her plants along the property line between the parties' properties. Ching testified that she heard giggling, and one of the Dung sisters reached over their fence and began spraying water over the fence with their hose. Ching testified that she did not say anything to them, but instead sprayed water back at them, because she was concerned that her washer and dryer were getting wet. Ching testified that she was arrested as a result of this incident, that she went to trial, and that she was acquitted.

The Dungs contend that this incident could not serve as a basis for submitting the malicious prosecution claim to the jury because (a) Ching's own testimony - that she admittedly sprayed her hose at the Dung sisters - established probable cause, and (b) probable cause was established by the independent

determination made by the prosecutor's office to proceed with the case, which determination broke the chain of causation between the Dungs and the prosecution of Ching.

The Hawai'i Supreme Court has held that:

[P]robable cause for the filing of a lawsuit exists where a person:

reasonably believes in the existence of the facts upon which the claim is based, and either

> (a) correctly or reasonably believes that under those facts the claim may be valid under the applicable law, or

> (b) believes to this effect in reliance upon the advice of counsel, sought in good faith and given after full disclosure of all relevant facts within his knowledge or information.

Arquette v. State, 128 Hawai'i 423, 434, 290 P.3d 493, 504 (2012) (citations omitted).

Here, the Dungs contend that Ching admitted "the facts upon which the claim is based," i.e., that Ching sprayed her hose at the Dung sisters. They make no argument regarding whether they correctly or reasonably believed that, under the facts of the hose incident, Ching's prosecution may be valid under applicable law.[14] Ching argues that while the Dung sisters may have had a subjective belief there was probable cause to prosecute, there was evidence presented upon which a jury could determine that their belief regarding probable cause was not objectively reasonable.

The Dungs argue, nevertheless, that the malicious prosecution claim should not have gone to the jury based on the

---

[14]    Nor do the Dungs argue that they relied upon advice of counsel.

hose incident because a prosecutor independently determined that there was probable cause to proceed, citing, *inter alia*, Bullen v. DeRego, 68 Haw. 587, 724 P.2d 106 (1986). In Bullen, the supreme court held that the defendants were insulated from tort liability because "the chain of causation of the harm occasioned by the constitutional violation was broken by the independent judgment of a judicial officer." Id. at 593, 724 P.2d at 110; see also Reed v. City & Cnty. of Honolulu, 76 Hawai'i 219, 230; 873 P.2d 98 109 (1994) (independent determination of probable cause by the committing judge broke the chain of causation). Although the claim in Bullen was based on the defendants' alleged conduct denying Bullen's right to compulsory process, 68 Haw. at 590-91, 724 P.2d at 108-09, as opposed to a malicious prosecution claim, the principle relied on by the supreme court in Bullen has been widely applied in cases that are more closely akin to the one at bar, including cases involving malicious prosecution claims.

For example, in Ames v. United States, 600 F.2d 183 (8th Cir. 1979), which is cited and quoted in Bullen, the Eighth Circuit Court of Appeals upheld the dismissal of, *inter alia*, claims for malicious prosecution, ruling that in the absence of "any specific allegation, such as the presentation of false evidence or the withholding of evidence, the grand jury indictment [broke] any chain of causation linking the [defendant] employees' activities to the institution of criminal proceedings, thus insulating the [defendants] from tort liability." Id. at

185 (citations omitted). <u>Bullen</u> also cites <u>Dellums v. Powell</u>, 566 F.2d 167 (D.C. Cir. 1977), wherein the D.C. Circuit Court of Appeals held that the tort liability of a police officer for malicious prosecution was barred by an independent decision by a prosecutor to file charges, so long as that decision was independent of any pressure or influence exerted by the officer and of any knowing misstatements by the officer to the prosecutor. <u>Id.</u> at 192-93. A memorandum opinion issued by a U.S. District Court judge helpfully compiles cases from numerous federal circuit courts that have applied this principle in various malicious prosecution claims against police officers. See <u>Adams v. Parsons</u>, No. 2:10-0423, 2011 WL 1464856 *5-6 (S.D. W.Va. Apr. 15, 2011) (mem. op.) (referencing cases from the Second, Third, Fourth, Fifth, Seventh, Ninth, Tenth, and Eleventh Circuit Courts of Appeal).

We conclude that in the absence of any specific allegation, such as the tort defendant's knowing presentation of false evidence, the withholding of evidence, or the exertion of pressure or influence on the prosecutor, a prosecutor's decision to bring charges in a criminal proceeding breaks the chain of causation linking a complainant's action in calling the police to the subsequent criminal proceedings, thus insulating the complainant from tort liability for malicious prosecution. To conclude otherwise would hold ordinary citizens to a higher standard of "reasonable belief" concerning the validity of claims under applicable law than law enforcement officers in similar

circumstances. Here, there is no evidence in the record that any false statements were made by the Dungs to the prosecutor, that they withheld evidence, or that they exerted pressure or influence on the prosecutor who filed the charges and took the case to trial. Ching's testimony was simply that she got arrested, the two Dung sisters testified, and that she was acquitted "on both charges."[15] Accordingly, we conclude that the Circuit Court erred in denying the Dungs' motion for JMOL on Ching's malicious prosecution claim.

E.    Further Issues Following Rulings on the Order re JMOL

For the reasons stated above, we have concluded that: although the Circuit Court did not err in denying JMOL with respect to Ching's nuisance claim, the verdict as to that claim must nevertheless be vacated; the Circuit Court erred in part when it submitted Ching's invasion of privacy claim to the jury; the Circuit Court did not err when it submitted Ching's defamation claim to the jury; and the Circuit Court erred when it submitted Ching's malicious prosecution claim to the jury.

The case was submitted to the jury with a form of Special Verdict that informed the jury that its verdict consists of a series of questions that must be answered, as directed in the Special Verdict. The questions included, serially, whether any of the Dungs engaged in a civil conspiracy against Ching, whether any of the Dungs engaged in any act of nuisance against

_____

[15]    There does not appear to be any testimony or other evidence in the record concerning what charges were brought against Ching arising out of the hose incident.

43

Ching, whether any of the Dungs invaded Ching's privacy, whether any of the Dungs defamed Ching, and whether Denby and/or Darah Dung engaged in an act of malicious prosecution against Ching.

After each of the civil conspiracy, nuisance, invasion of privacy, and defamation questions, if the jury had responded yes, the jury was asked to select, from a list, which of the Dungs engaged in the conduct; the civil conspiracy and nuisance lists included Annette, Dixon, Dean, Denby, and Darah, and the invasion of privacy and defamation lists included Annette, Dean, Denby and Darah (and not Dixon). With respect to the nuisance, invasion of privacy, defamation, and malicious prosecution claims, the jury was further asked whether the conduct was a legal cause of damages to Ching.

With respect to the invasion of privacy claim, the jury was instructed on all three legal theories, i.e., intrusion upon seclusion, unreasonable publicity, and false light. However, the Special Verdict simply asked whether any of the Dungs invaded Ching's privacy, without distinction between these theories, and the jury determined that Annette, Denby, and Darah (but not Dean) invaded Ching's privacy, without any distinction between theories.[16] Thus, it cannot be determined from the Special Verdict whether the jury found that Annette, Denby, and Darah all invaded Ching's privacy by, for example, intruding upon her seclusion or by giving unreasonable publicity to her private life

---

[16] The jury also determined that Annette, Denby, and Darah (but not Dean) defamed Ching.

or by putting her in a false light (or some combination of these).

With respect to the civil conspiracy claim, the Special Verdict did not identify or ask the jury to determine what tortious act or acts the Dungs allegedly agreed to commit. Nevertheless, the jury found that everyone listed, *i.e.*, Annette, Dixon, Dean, Denby, and Darah, all engaged in an unspecified civil conspiracy against Ching, based upon the following jury instruction:

> [Ching] claims that the [Dungs] engaged in a civil conspiracy. A civil conspiracy is an agreement by two or more persons to commit a wrongful act. Mere acquiescence or knowledge is not sufficient to constitute a conspiracy - there must be approval, cooperation or agreement. This agreement need not be a formal or expressed agreement. Its existence is a subject of inference for you, the jury, from all the facts submitted in evidence.
>
> When [Ching] proves that a wrongful act has been committed by one defendant, a finding of civil conspiracy subjects each conspirator to liability for the wrongful act.

The Hawai'i Supreme Court has held that "the accepted definition of a [civil] conspiracy is a combination of two or more persons or entities by concerted action to accomplish a criminal or unlawful purpose, or to accomplish some purpose not in itself criminal or unlawful by criminal or unlawful means." Robert's Haw. Sch. Bus, Inc. v. Laupahoehoe Transp. Co., 91 Hawai'i 224, 252 n.28, 982 P.2d 853, 881 n.28 (1999) (citation, internal quotation marks, and original brackets omitted), superseded by statute on other grounds as stated in Haw. Med. Ass'n v. Haw. Med. Serv. Ass'n, 113 Hawai'i 77, 148 P.3d 1179 (2006). The United States Supreme Court has explained:

By . . . 1970, it was widely accepted that a plaintiff could bring suit for civil conspiracy only if he had been injured by an act that was itself tortious. See, e.g., 4 Restatement (Second) of Torts § 876, Comment b (1977) ("The mere common plan, design or even express agreement is not enough for liability in itself, and there must be acts of a tortious character in carrying it into execution"); W. Prosser, Law of Torts § 46, p. 293 (4th ed. 1971) ("It is only where means are employed, or purposes are accomplished, which are themselves tortious, that the conspirators who have not acted but have promoted the act will be held liable" (footnotes omitted)); Satin v. Satin, 69 A.D.2d 761, 762, 414 N.Y.S.2d 570 (1979) (Memorandum Decision) ("There is no tort of civil conspiracy in and of itself. There must first be pleaded specific wrongful acts which might constitute an independent tort"); Cohen v. Bowdoin, 288 A.2d 106, 110 (Me. 1972) ("'[C]onspiracy' fails as the basis for the imposition of civil liability absent the actual commission of some independently recognized tort; and when such separate tort has been committed, it is that tort, and not the fact of combination, which is the foundation of the civil liability"); Earp v. Detroit, 16 Mich.App. 271, 275, 167 N.W.2d 841, 845 (1969) ("Recovery may be had from parties on the theory of concerted action as long as the elements of the separate and actionable tort are properly proved"); Mills v. Hansell, 378 F.2d 53 (C.A.5 1967) (per curiam) (affirming dismissal of conspiracy to defraud claim because no defendant committed an actionable tort); J. & C. Ornamental Iron Co. v. Watkins, 114 Ga.App. 688, 691, 152 S.E.2d 613, 615 (1966) ("[The plaintiff] must allege all the elements of a cause of action for the tort the same as would be required if there were no allegation of a conspiracy"); Lesperance v. North American Aviation, Inc., 217 Cal.App.2d 336, 345, 31 Cal.Rptr. 873, 878 (1963) ("[C]onspiracy cannot be made the subject of a civil action unless something is done which without the conspiracy would give a right of action" (internal quotation marks omitted)); Middlesex Concrete Products & Excavating Corp. v. Carteret Indus. Assn., 37 N.J. 507, 516, 181 A.2d 774, 779 (1962) ("[A] conspiracy cannot be made the subject of a civil action unless something has been done which, absent the conspiracy, would give a right of action"); Chapman v. Pollock, 148 F.Supp. 769, 772 (W.D.Mo.1957) (holding that a plaintiff who charged the defendants with "conspiring to perpetrate an unlawful purpose" could not recover because the defendants committed no unlawful act); Olmsted, Inc. v. Maryland Casualty Co., 218 Iowa 997, 998, 253 N.W. 804 (1934) ("[A] conspiracy cannot be the subject of a civil action unless something is done pursuant to it which, without the conspiracy, would give a right of action"); Adler v. Fenton, 65 U.S. 407, 24 How. 407, 410, 16 L.Ed. 696 (1860) ("[T]he act must be tortious, and there must be consequent damage").

Beck v. Prupis, 529 U.S. 494, 501-03 (2000) (emphasis omitted).

Consistent with this principle, courts have observed that a conspiracy claim is not an independent cause of action, but is only the mechanism for subjecting co-conspirators to

liability when one of their members committed a tortious act. See, e.g., Royster v. Baker, 365 S.W.2d 496, 499-500 (Mo. 1963) ("[A]n alleged conspiracy by or agreement between the defendants is not of itself actionable. Some wrongful act to the plaintiff's damage must have been done by one or more of the defendants, and the fact of a conspiracy merely bears on the liability of the various defendants as joint tort-feasors"); Halberstam v. Welch, 705 F.2d 472, 479 (D.C. Cir. 1983) ("[s]ince liability for civil conspiracy depends on performance of some underlying tortious act, the conspiracy is not independently actionable; rather, it is a means for establishing vicarious liability for the underlying tort"). It cannot be determined from the Special Verdict whether the jury found that the Dungs conspired to engage in, for example, one or more acts of nuisance, or alternatively, that they all conspired to commit one or more of the other tortious acts alleged by Ching. Thus, based on our inability to determine whether the jury's finding of a civil conspiracy was based on the jury's finding of defamation or either the false light or unreasonable publicity theory of invasion of privacy arising out of the Facebook postings, as opposed to nuisance, a nonviable invasion of privacy theory, or malicious prosecution, Ching's civil conspiracy claim must be vacated and retried in order to establish vicarious liability for one or more underlying torts.[17]

---

[17]     Although not raised on this appeal, as we are remanding for a new trial, we note that, even when the jury instructions are read and considered
(continued...)

In addition to the above, the jury was asked, without distinction between claims, theories, or defendants, to determine Ching's special, general, and punitive damages. The jury awarded special damages of $16,000, general damages of $500,000, and punitive damages of $100,000.

In light of our decision to vacate the judgment with respect to Ching's nuisance, invasion of privacy, malicious prosecution, and conspiracy claims, we must address what is the appropriate remedy under the circumstances of this appeal. To aid in our consideration of this issue, prior to oral argument, this court asked the parties to submit supplemental memoranda addressing the following issue:

> Where unsegregated amounts of special damages, general damages, and/or punitive damages, are awarded on multiple claims that were submitted to a jury under multiple theories of liability, and one or more, but not all, of the theories are rejected and/or claims are vacated on appeal, what is the appropriate remedy?

Ching argues that we need not reach the issue because, *inter alia*, the Dungs did not object to the form of Special Verdict or specifically raise it as a point of error, the form of Special Verdict was well within the Circuit Court's discretion and correctly allowed a determination of Ching's damages for any claim(s) that she prevailed on, and the Dungs' joint tortfeasor/co-conspirator status makes an allocation between them irrelevant. In addition, Ching argues that this court should

---

[17](...continued)
as a whole, under the facts and circumstances of this case, the jury instructions concerning civil conspiracy may be prejudicially insufficient, erroneous, or misleading.

apply a doctrine that some courts call the "general verdict rule," which provides that where several counts are tried, a general verdict will be upheld if any one count is supported by substantial evidence and is unaffected by error, in the absence of an objection to the form of verdict.[18]

The Dungs argue that, under the circumstances, it would be impossible for this court to determine what portion of the lump sum damages are attributable to vacated findings of liability, citing, *inter alia*, Rodrigues v. State, 52 Haw. 156, 472 P.2d 509 (1970), and various other cases holding that a new trial is required when it is impossible to tell whether the verdict is based upon a claim that is erroneously submitted to the jury.

We first consider, as we must, Hawai'i case law. In Rodrigues, the Hawai'i Supreme Court stated and held:

> The trial court did not designate the sum awarded for each head of damages but awarded a lump sum for 'mental anguish and suffering, inconvenience, disruption of home and family life, past and future, etc.' The evidence did not warrant damages for 'future' disruption of home and family life. Also, it was clear error to include 'etc.' in the award as a head of damages. The State contends that the failure to award separate verdicts as to damages on each of the heads of damages was error. The award of a lump sum for different claims is not reversible error. However, failure to state the amount awarded for each claim makes it impossible for the reviewing court, absent any other indication in the record, to amend the lump sum award when it is decided on appeal that error was committed concerning the consideration of a particular claim by the factfinder, the excessiveness or adequacy of an award, or the evidence necessary to sustain an award. See Mayne, Damages 534 (4th ed. 1884); Watson, Damages and Personal Injuries § 340 at 425 (1901); 4 Sedgewick, Damages § 1276 at 2612 (9th ed. 1912). The result is an unnecessary retrial of issues. While in this case we must remand with instructions to

---

[18] Ching submits that if one (or more) of the Dungs is exonerated on appeal from both the civil conspiracy and all intentional torts, then the judgment should be amended to exclude that particular defendant only.

> reduce the lump sum award accordingly, we hold that where claims are independent and there is a likelihood that collateral questions concerning the claims may be raised in the future, the trial judge on his own motion or on motion by counsel should direct that separate verdicts on damages be returned on each of the claims to aid the reviewing court in isolating error and to prevent unnecessary retrial of issues. Nylander v. Rogers, 41 N.J. 236, 196 A.2d 1 (1963); cf. McCormick, Damages § 16 at 67.

Id. at 175, 472 P.2d at 521.

Accordingly, in Rodrigues, the supreme court held that where error was committed concerning the trier of fact's consideration of a particular claim or claims, a lump sum award was not reversible error; however, the failure to state the amount awarded for each claim made it impossible for the reviewing court in that case to simply amend the award and allow damages only on the claims that warranted an award of damages. Id. The court specifically held that "where claims are independent and there is a likelihood that collateral questions concerning the claims may be raised in the future, the trial judge on his own motion or on motion by counsel should direct that separate verdicts on damages be returned on each of the claims to aid the reviewing court in isolating error and to prevent unnecessary retrial of issues." Id. In the case at bar, Ching's conspiracy claim is dependent on one or more of the other torts, but at least some of her other claims – such as the nuisance claim and the defamation claim – are either factually and/or legally independent of one other. Under Rodrigues, we cannot conclude that the lump sum awards in favor of Ching were reversible error, but they make it impossible for this court, on

the record in this case, to determine the amount awarded for each claim.[19]

Ching argues, in part, that the Dungs failed to object to the Special Verdict (and in fact agreed to it), thus rendering it unreviewable in this appeal. As stated above, however, we do not conclude that the use of the Special Verdict constituted error;[20] rather, in this case, it is impossible for this court to determine the amount of damages supported by the undisturbed claim. Ching further argues that, as joint tortfeasors and co-conspirators found liable for intentional torts against her, the Dungs are liable for the entirety of her damages and her damages need not be apportioned amongst them. See, e.g., HRS § 663-11 (2016) (defining joint tortfeasors). Under different circumstances, we might agree with the application of this principle, which might even be applicable in this case upon resolution of the other issues addressed above; on this appeal, however, only Annette, Denby, and Darah's liability for defamation is being fully affirmed, and it is unclear what

---

[19] We note that, unlike the plaintiff in Rodriques, Ching might still prevail on all claims submitted to the jury, except for the malicious prosecution claim. Upon remand, a new jury could award the same - or even greater - damages, notwithstanding dismissal of the malicious prosecution claim and our ruling limiting Ching's invasion of privacy theories.

[20] Ching also cites, inter alia, Gonsalves v. Nissan Motor Corp. in Haw., 100 Hawai'i 149, 58 P.3d 1196 (2002), for the proposition that a trial court has complete discretion to use a special or general verdict, as well as to determine the questions submitted to the jury, so long as the questions are "adequate to obtain a jury determination of all factual issues essential to judgment." Id. at 158, 58 P.3d at 1205 (citations and internal quotation marks omitted). As previously stated, we recognize the trial court's discretion, but nevertheless, we cannot determine, inter alia, the amount of damages supported by the undisturbed claim based on the Special Verdict in this case.

tortious conduct the jury found to be underlying a conspiracy, and the application of this principle is premature.

Finally, Ching contends that this court should adopt the view of courts that uphold a jury's general verdict for a party, if no party requested interrogatories, and at least one cause of action is supported by substantial evidence and is unaffected by error, despite possible defects as to remaining counts. See, e.g., MacDermid, Inc. v. Leonetti, 183 A.3d 611, 628-29 (Conn. 2018) (Connecticut generally applies rule that if any ground for a verdict is proper, it must stand); Tavaglione v. Billings, 847 P.2d 574, 579 (Cal. 1993) (in bank); see also, e.g., Plains Commerce Bank v. Long Family Land & Cattle Co., 910 F. Supp. 2d 1188, 1194-98 (D.S.D. 2012) (compiling and discussing numerous federal and state court decisions addressing this issue variously). Although a number of states have adopted this view, it appears that the federal courts and a majority of state courts generally apply the opposite rule. See Plains Commerce Bank, 910 F. Supp. 2d at 1194-98 (citations omitted).

The "majority" rule stems from the United States Supreme Court's decision in Maryland v. Baldwin, 112 U.S. 490 (1884), wherein the court explained that if a verdict's "generality prevents us from perceiving upon which plea [the jury] found," and "any one issue error was committed, either in the admission of evidence or in the charge of the court, the verdict cannot be upheld, for it may be that by that evidence the jury were controlled under the instructions given." Id. at 493.

In other words, "when one of two or more issues submitted to the jury was submitted erroneously, a general verdict cannot stand because it cannot be determined whether the jury relied on the improper ground." Farrell v. Klein Tools, Inc., 866 F.2d 1294, 1299 (10th Cir. 1989). The supreme court has reiterated its "general verdict rule"[21] on several instances, including in Sunkist Growers, Inc. v. Winckler & Smith Citrus Prods. Co., 370 U.S. 19, 29-30 (1962); United N.Y. & N.J. Sandy Hook Pilots Ass'n v. Halecki, 358 U.S. 613, 619 (1959); Robinson v. California, 370 U.S. 660, 662, 665 (1962). Some courts have followed the Baldwin rule strictly, whereas others have adopted a harmless error analysis or applied an exception, to uphold a verdict notwithstanding improper grounds for one or more counts. See, e.g., Farrell, 866 F.2d at 1299-1300; Webb v. Sloan, 330 F.3d 1158, 1166 (9th Cir. 2003).

We conclude that the Hawai'i Supreme Court's decision in Rodrigues – which held it was necessary to remand the case where a general verdict was based in part on claims that were erroneously considered by the fact-finder in awarding damages – is most consistent with the application of the Baldwin rule – which holds that a general verdict cannot stand when one or more issues are erroneously submitted to a jury. Indeed, the rationale expressed is essentially the same. The Hawai'i Supreme

---

[21] Confusingly, courts espousing both of these opposing views have referred to their interpretation as the "general verdict rule." Other than to note the conflicting use of the term, we will attempt to minimize reference to it.

Court stated that it was impossible for the reviewing court to amend a lump sum award, without some indication in the record as to the allocation of the damages, and the United States Supreme Court stated that the generality of the verdict prevented the reviewing court from perceiving which claim or theory the jury found to be meritorious. Compare Rodrigues, 52 Haw. at 175, 472 P.2d at 521, with Baldwin, 112 U.S. at 493, and Sunkist Growers, Inc., 370 U.S. at 29-30. Accordingly, we reject Ching's request that this court adopt the rule applied in Connecticut, and elsewhere, stating that if any ground for a verdict is proper, the verdict must stand.[22]

Indeed, we conclude that we would remand this case even under the any-proper-ground standard. Here, the only claim to be fully upheld on appeal is the defamation award in favor of Ching and against Annette, Denby, and Darah (but not Dean and Dixon). Thus, even if we could properly determine that the damages for the reputational harm suffered by Ching for the established incidents defamation were the same as the damages allegedly suffered by Ching for the alleged nuisance in this case, for example, we could not conclude that those damages could properly

---

[22]    We need not reach the question of whether Hawai'i courts would apply a "strict" Baldwin standard, or a less restrictive approach utilizing a harmless error analysis. We note, however, that the Rodrigues court suggested that remand might not always be necessary, when it couched its ruling in terms of "impossibility" and the "absen[ce] of any other indication in the record." 52 Haw. at 175, 472 P.2d at 521. Thus, it appears that a new trial might not be necessary if an error in submission of a claim to the jury is harmless, for example, if it can be determined from the record that the damages were the same under a properly submitted claims. Cf., e.g., Ondrisek v. Hoffman, 698 F.3d 1020, 1026-27 (8th Cir. 2012) (upholding general damages award after reversing one theory because the same damages award would have resulted under any of the theories presented).

stand against more than three of the five defendants found to be jointly liable to Ching.  Moreover, "the interest protected by defamation actions is that of reputation," Nakamoto, 142 Hawai'i at 271, 418 P.3d at 612 (citation omitted), whereas the interest protected by nuisance actions such as the one at bar is frequently that of the free use or enjoyment of one's property. See, e.g., Littleton, 66 Haw. at 67, 656 P.2d at 1344; Restatement of Torts § 822.  Accordingly, we cannot conclude, absent some specific indication in the record, that the damages suffered by Ching would be the same for both of these injuries, for example.

For these reasons, we conclude that the damages award in favor of Ching must be vacated and remanded.

F.    Evidence of Attorneys' Fees as Punitive Damages

Ching argues that the Circuit Court abused its discretion by not allowing her to present evidence of her attorneys' fees and costs as part of her claim for punitive damages and by sustaining the Dungs' objection to the same on the grounds that the proposed evidence lacks foundation and relevance.

Ching sought to admit evidence of her attorneys' fees and costs at trial to support her claim for punitive damages, citing Kunewa v. Joshua, 83 Hawai'i 65, 924 P.2d 559 (App. 1996), and Lee v. Aiu, 85 Hawai'i 19, 936 P.2d 655 (1997).  The Circuit Court denied her request, ruling that under Kunewa, she was only entitled to do so if her claims against the Dungs involved claims

55

of self-dealing or profit by the Dungs. The Circuit Court erred in so concluding. In Kunewa, this court considered whether it was appropriate for the jury to consider the plaintiff's attorneys' fees in fashioning a punitive damages award. 83 Hawai'i at 73-77, 924 P.2d at 567-71. This court adopted the rule in the majority of jurisdictions, which is supported by the Restatement of Torts, that "regularly allow a jury to consider attorney fees in computing the amount of punitive damages." Id. at 74, 924 P.2d at 568 (citations omitted). We discussed that one of the criticisms of punitive damages awards is that the jury's discretion is often unfettered and unguided; in this context, we stated that allowing the jury to consider attorneys' fees in determining an award of punitive damages would provide to the jury some objective criteria to guide a punitive damages award. See id. at 75-77, 924 P.2d at 569-71. We noted that other objective criteria have been used to evaluate the propriety of a punitive damages award on appeal, including, inter alia, the profitability to the defendant of their wrongful conduct. Id. at 75, 924 P.2d at 569. However, we did not hold that any single factor, including profitability of one's wrongful conduct, was required before attorneys' fees could be admitted into evidence in support of an appropriate punitive damages award.

In Lee v. Aiu, the supreme court clarified that (1) the attorneys' fees must be reasonable and necessary, and (2) the attorneys' fees cannot be awarded in addition to exemplary damages, but "must constitute the whole of the punitive damage

award or be accounted for as a portion of the total punitive damage award." 85 Hawai'i at 34-35, 936 P.2d at 670-71 (citations omitted). The court reaffirmed this holding in <u>Kekona v. Bornemann</u>, 135 Hawai'i 254, 349 P.3d 361 (2015), explaining:

> In <u>Lee</u>, this court adopted "the majority view that a jury should be allowed to consider a plaintiff's attorney fees in determining the amount of a punitive damages award." 85 Hawai'i at 34, 936 P.2d at 670 (citing <u>Masaki v. General Motors Corp.</u>, 71 Haw. 1, 8 n.2, 780 P.2d 566, 572 n.2 (1989); <u>Kunewa v. Joshua</u>, 83 Hawai'i 65, 77, 924 P.2d 559, 571 (App. 1996)). There are two limitations: First, "[w]hen considering attorney's fees in calculating the amount of the punitive damage award, the fee amount must be 'reasonable and necessary.'" <u>Id.</u> at 35, 936 P.2d at 671 (citation omitted). Second, "[a]ttorneys' fees cannot be awarded in addition to exemplary damages; rather, they must constitute the whole of the punitive damage award or be accounted for as a portion of the total punitive damage award." <u>Id.</u>; <u>see also</u> <u>Romero [v. Hariri]</u>, 80 Hawai'i [450,] 458-59, 911 P.2d [85,] 93-94 [(App. 1996)].

<u>Id.</u> at 264, 349 P.3d at 371. Neither this court nor the Hawai'i Supreme Court has held that a profit motive by the defendant is required before evidence of attorneys' fees may be admitted to fashion a punitive damages award.

For these reasons, we conclude that the Circuit Court erred in determining that Ching could not present evidence regarding her attorneys' fees in support of her request for punitive damages on this ground.

G.    <u>Evidence of Reasonableness and Necessity of Fees</u>

Ching argues that the Circuit Court abused its discretion when it denied her Motion for Additur or New Trial when it determined that Ching would not have been competent to testify as to the reasonableness and necessity of the fees and costs that she incurred in this matter and that she would need an expert to testify to the same. The Circuit Court denied the

Motion for Additur or New Trial because it found that the evidence of attorneys' fees was inadequate to put to the jury because Ching was not competent to testify as to whether the attorneys' fees she incurred were reasonable and necessary. Ching had no expert designated to testify regarding the reasonableness and necessity of her attorneys' fees at trial.

In Kekona, the supreme court addressed the reasonable and necessary attorney's fees issue as follows:

> As a starting point, the punitive award contains a sizable component that corresponds to the Kekonas' two decades of attorney's fees. [T]his court [has] adopted the majority view that a jury should be allowed to consider a plaintiff's attorney fees in determining the amount of a punitive damages award. There are two limitations: First, [w]hen considering attorney's fees in calculating the amount of the punitive damage award, the fee amount must be 'reasonable and necessary. Second, [a]ttorneys' fees cannot be awarded in addition to exemplary damages; rather, they must constitute the whole of the punitive damage award or be accounted for as a portion of the total punitive damage award.
>
> In this case, the Kekonas presented sufficient evidence for the jury to conclude that they had accrued $600,000 in attorney's fees and expenses over fourteen years of litigation. Their attorney's fees reasonably corresponded to the extensive discovery required to expose the fraudulent transfer, three jury trials, the cost of hiring expert witnesses, voluminous pre-trial and post-trial motions, and several appeals to the ICA and to this court. Although Bornemann attempted to impeach Mrs. Kekona because she did not introduce written documentation of the attorney's fees she incurred, the testimony of a single witness, if found credible by the jury, constitutes sufficient evidence to support a finding. Here, Mrs. Kekona's testimony regarding the attorney's fees she had incurred as a result of Bornemann's conduct was sufficient to sustain $600,000 of the punitive award.
>
> Bornemann argues that the Kekonas have grossly exaggerated their fees and costs. First, he argues that the fees incurred were not solely incurred against him, and that large portions corresponded to litigation against other defendants. However, it is well settled that where the wrongful act of a defendant causes a plaintiff to engage in litigation with a third party in order to protect his or her rights or interests, attorney's fees incurred in litigating with that third party may be chargeable against the wrongdoer as an element of the plaintiff's damages.

> Second, Bornemann argues that some of the attorney's fees corresponded to the original jury trial in the Hanauma Bay case. At trial, Bornemann could have cross-examined Mrs. Kekona on that point, but he did not. . . .
>
> Third, Bornemann cites the ICA's 2006 Memorandum Opinion as evidence that only $200,000 in fees had been incurred over the course of the first two trials. Bornemann argues that the additional $400,000 claimed by Mrs. Kekona defies logic or belief. Again, this point could have been raised in cross-examination to impeach Mrs. Kekona's testimony, but was not.
>
> In sum, $600,000 of the $1,642,857.13 punitive award is justified as compensation for attorney's fees and costs.

Kekona, 135 Hawai'i at 264-65, 349 P.3d at 371-72 (citations, footnote, and internal quotation marks omitted; emphasis added).

Thus, in analyzing and applying the reasonable and necessary standard in Kekona, the supreme court concluded that the testimony of a single lay witness was sufficient to sustain the award of $600,000 of the punitive damages that was related to the plaintiff's attorney's fees. Id. The court noted that challenges to the reasonableness and necessity could have been raised by the defendant on cross-examination, but were not. Id. at 265, 349 P.3d at 372. In other circumstances, the supreme court has recognized the expertise of judges, as legal experts, in assessing the reasonableness and necessity of attorneys' fees and the importance of their personal knowledge concerning the complexity of a particular litigation and the nature and quality of legal services. See Stanford Carr Dev. Corp. v. Unity House, Inc., 111 Hawai'i 286, 306, 141 P.3d 459, 479 (2006). Thus, we conclude that the Circuit Court erred in barring Ching's testimony regarding her attorneys' fees as part of her request for punitive damages, and that the Dungs' remedy for Ching's lack

of expertise was to avail themselves of avenues of cross-examination and/or expert testimony challenging Ching's testimony regarding the reasonableness and necessity of the subject fees and costs.

V.   CONCLUSION

For these reasons, we vacate the Circuit Court's September 15, 2016 Judgment, November 14, 2016 Order Denying Additur, April 12, 2016 Order re JMOL, January 4, 2017 Order Denying Further JMOL, and January 4, 2017 Order Denying New Trial.   This case is remanded to the Circuit Court for a new trial consistent with this Opinion.

On the briefs:

Terrance M. Revere,
Malia R. Nickison-Beazley,
(Revere & Associates),
for Plaintiff-Appellant.

Jonathan L. Ortiz,
Wade J. Katano,
Christine S. Prepose-Kamihara,
(Ortiz & Katano),
for Cross-Appellee.

Ronald Shigekane,
(Chong, Nishimoto, Sia, Nakamura,
 & Goya)

        and

David J. Minkin,
Jesse J.T. Smith,
(McCorriston Miller Mukai
 MacKinnon LLP),
for Defendants-Appellees/
 Cross-Appellants.